

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 1 4 2017

JAMES W. McCORMACK, CLERK
By:_____
PLAINTIFFS        DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## JONESBORO DIVISION

**BRUCE FARMS PARTNERSHIP;**
**RONNIE BRUCE;**
**KAREN BRUCE;**
**CALEB BRUCE;**
**CURTIS NASH;**
**DENA NASH;**
**CURTIS & DENA NASH JV;**
**LA FARMS, INCORPORATED;**
**On behalf of themselves and all**
**Others similarly situated**

**vs.**                    Civil Case No. _3:17-cv-154-DPM_

**MONSANTO COMPANY;**                         **DEFENDANTS**
**BASF SE;**                   This case assigned to District Judge _Marshall_
**BASF CORPORATION; and**       and to Magistrate Judge _Volpe_
**JOHN DOE COMPANIES A - Z**

### COMPLAINT – CLASS ACTION

COMES NOW Plaintiffs, Bruce Farms Partnership, Ronnie Bruce, Karen Bruce, and Caleb Bruce, on behalf of themselves, all others similarly situated, and the class they seek to represent for their Complaint against the named Defendants herein, state as follows:

### INTRODUCTION AND SUMMARY OF THE CLAIMS

1.     This lawsuit against Defendants concerns Defendants' wrongful and unlawful conduct in controlling and developing the "dicamba crop system." Defendants have intricate knowledge of the agricultural process, including planting and herbicides. Under this superior knowledge of the agricultural production process and their market domination, Defendants implemented and controlled the dicamba crop system. Dicamba is a herbicide, which harms crops, fruit or trees, which are not resistant to

dicamba.  The dicamba crop system inextricably links dicamba-resistant seeds with dicamba-based herbicides. Plaintiffs bring this nationwide class action on behalf of farmers whose crops have been materially and significantly damaged by Defendants negligent control, development and distribution of the dicamba crop system, which proximately caused significant and material injury and damage to Plaintiffs' crops in 2016.

2.    Defendant, Monsanto Company, developed and released a genetically modified ("GM") Round Up Ready Xtend Crop System (hereinafter "Xtend Crop System"), which includes Monsanto's Roundup Ready 2 Xtend soybeans (hereinafter "Xtend soybeans") and Bollgard II Xtend cotton seeds (hereinafter "Xtend cotton") (collectively hereinafter "Xtend Products" as early as 2015.

3.    GM seeds are designed to combat problematic weeds that have become resistant to certain herbicides over time.

4.    The Xtend Crops are resistant to both glyphosate, the main active ingredient in the Monsanto's most popular herbicide, Roundup, and dicamba. However, the rising tolerance to Roundup made dicamba a necessary herbicide for crop survival due to rising weed resistance.

5.    In early 2009, Monsanto partnered with BASF, a German chemical company and the largest chemical producer in the world, and agreed to a joint licensing agreement to accelerate the development of dicamba-based weed control products.

6.    Monsanto identifies the Xtend Products as a "crop system," meaning the Xtend Products and the dicamba-based herbicide, VaporGrip ™, are designed for use in conjunction with one another.

7.      Monsanto's own website identifies the Xtend Products as a "crop system" and identifies dicamba-resistant seeds (Xtend) and the dicamba-based herbicides (VaporGrip) that should be used in conjunction with one another. However, Monsanto sold the seeds before the EPA approved a safe dicamba-based herbicide.

8.      Monsanto sold the Xtend Products before the EPA approved the dicamba-based herbicide, VaporGrip ™, for market.

9.      At all times relevant to this Complaint, any in-crop use of a dicamba on the Xtend Products was a violation of federal and state law.

10.     Defendants did not sell, distribute, or release dicamba-based herbicides in 2015 or within the 2016 growing season, as the herbicide labels had not received regulatory approval from the Environmental Protection Agency (hereinafter "EPA").

11.     Farmers relied on Defendants to produce a safe and approved herbicide that would be sold on the market during the 2016 growing season. However, the approval for dicamba-based herbicides did not occur until *after* the 2016 growing season.

12.     On November 9, 2016, *well after* the growing season had completed, Monsanto finally received conditional regulatory approval from the EPA. The conditional approval was for only two (2) years for a Monsanto VaporGrip ™ product, an herbicide called XtendiMax ™ with VaporGrip ™ Technology ("XtendiMax").

13.     On December 20, 2016, *well after* the growing season had completed, BASF finally received approval of its dicamba-based herbicide, Engenia ™.

14.     Before November 9, 2016, which would be all relevant times to this Complaint, the EPA had stated, "Current allowable uses for dicamba products are

restricted to **pre-plant and post-harvest burndown applications**." The EPA also stated, "Dicamba is a **highly volatile herbicide prone to move off target by the way of drift or through vapor volatility**."

15.     Monsanto represents VaporGrip ™ will have a lower volatility formulation that will minimize (though not entirely eliminate) drift – a term used to describe the airborne movement of herbicide spray target spray site to non-target or neighboring spray sites several miles away.

16.     With no approved dicamba-based herbicide to complete the Xtend Crop System, farmers who purchased the Xtend soybeans and cotton were only left with two undesirable options: (1) allow their crops and livelihood to be destroyed by weed overgrowth or (2) spray the only dicamba on the market – old, volatile dicamba – to sustain a viable crop.

17.     By jointly researching and developing dicamba-resistant seeds and dicamba-based weed control products, Defendants' knew or should have known that releasing dicamba-resistant seeds without an accompanying dicamba-based herbicide that farmers would be placed in a precarious position. Yet, Defendants continued with their wrongful conduct directed toward the Plaintiffs because of their control of the dicamba-herbicide and dicamba-resistant seed market, suppressing, concealing and omitting information regarding the volatile and injurious nature of their products from Plaintiffs while knowing the harm that Defendants products could cause to Plaintiffs.

18.     Defendants' scheme and overall conspiracy to control the dicamba crop system while concealing, omitting and suppressing material facts of the dangers of its product to Plaintiffs, resulted in harm, which Defendants knew would result due to the

unsafe, dangerous and volatile nature inherent with its product.   Further, with Defendants' knowledge, predominating scheme and implementation of a crop system involving dicamba, it was foreseeable with a seed designed to resist dicamba that farmers would be forced to apply the only dicamba on the market – old, highly volatile, drift-prone dicamba – to their dicamba-resistant soybeans and cotton.

      19.     Monsanto willfully, wantonly, knowingly and negligently violated the industry practice and legal standards by releasing its Xtend Products on the market without an existing, approved, safe herbicide.

      20.     Because of Defendants' overarching and predominating wrongful conduct knowing that through their control of the agricultural process involving dicamba-resistant seeds and herbicides, farmers across the nation have been victimized by Monsanto's deceptive, negligent, fraudulent trade practices by negligently releasing its Xtend Products and its purchasers'' inevitable use of dicamba that has wiped out thousands of acres of farmland and caused millions of dollars of damage to farmland across the United States, particularly Alabama, Arkansas, Illinois, Kentucky, Minnesota, Mississippi, North Carolina, Tennessee, and Texas (hereinafter "Affected States").

      21.     Throughout the Affected States, state departments of agriculture have been besieged with complaints from farmers, including Plaintiffs, about pesticide drift and resultant crop damage. For instance:

     a) There have been nearly 200 pesticide drift complaints in Missouri since Monsanto launched its defective crop system for soybeans and cotton in 2015. *See* http://www.wsj.com/articles/farmers-illegal-use-of-herbicide-takes-toll-onneighboring-crops-147013020 (last visited Jan. 18, 2017);

b) Tennessee also reported at least 45 complaints related to pesticide drift. *See* https://www.dtnpf.com/agriculture/web/ag/news/article/2016/08/03/states-digdicamba-claims (last visited Jan. 18, 2017); and

c) According to the Arkansas Plant Board, approximately 40 complaints related to dicamba-based herbicide drift to non-target sites has occurred.

d) Missouri's Department of Agriculture has received more than 100 drift complaints, mostly in Cape Girardeau, Dunklin, New Madrid, and Stoddard counties. "The complaints allege damage to more than 41,000 acres of soybeans, and other crops including peaches, tomatoes, watermelons, cantaloupe, rice, purple-hull peas, peanuts, cotton and alfalfa, as well as to residential gardens, trees and shrubs."

22.     Because of Defendants' willful conduct, 9Plaintiffs' crops are not resistant to dicamba and have been devastated by dicamba damage due to the spraying of old, volatile, drift-prone dicamba over Xtend Products. Accordingly, Plaintiffs bring this action under (1) strict products liability; (2)   negligence; (3) breach of implied warranty of fitness for a particular purpose; 4) breach of implied warranty of merchantability (5) fraud; (5) Arkansas Deceptive Trade Practices Act negligent  (7) unjust enrichment; (8) civil conspiracy; and (9) class action.  Plaintiffs seek relief in the form of compensatory damages, punitive damages, and attorneys' fees and other costs of litigation.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this lawsuit seeking class certification pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332(d) because this is a class action where members of the putative class are citizens of

different states than Defendants and the aggregate claims of all members of the class are in excess of five million dollars ($5,000,000.00), exclusive of interest and costs. Plaintiffs individually also seek more than $75,000, and are diverse from Defendants.

24.    Plaintiffs are residents and citizens of Craighead County Arkansas and represent similarly situated injured persons and entities from various states.

25.    At all relevant times herein, Defendants have jointly researched, designed, formulated, compounded, developed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised and made representations regarding dicamba-resistant crops and dicamba herbicide.

26.    This Court has personal jurisdiction over the parties. Defendants engage in continuous, systematic and continually conduct business in the State of Arkansas, avail themselves of the opportunity to conduct business in this State, sell products, market, advertise and distribute products in this State and have committed tortious acts in the State of Arkansas.

27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants have engaged in substantial conduct and business relevant to Plaintiffs' claims within this District. Plaintiffs and similarly situated members of the Defined Class have suffered substantial losses from dicamba herbicides due to Defendants' wrongful conduct within this District and it is where Plaintiffs reside.

## PARTIES

28.    Plaintiff Bruce Farms Partnership farms soybean and watermelons in Craighead County, Arkansas.

29.     Plaintiff Ronnie Bruce farms soybean and watermelons in Craighead County, Arkansas.

30.     Plaintiff Karen Bruce farms soybean and watermelons in Craighead County, Arkansas.

31.     Plaintiff Caleb Bruce farms soybean and watermelons in Craighead County, Arkansas.

32.     Plaintiff Curtis Nash farms soybean in Monroe County, Arkansas.

33.     Plaintiff Dena Nash farms soybean in Monroe County, Arkansas.

34.     Plaintiff Curtis & Dena Nash JV farms soybean in Monroe County, Arkansas.

35.     Plaintiff LA Farms, Incorporated farms soybean in Monroe County, Arkansas.

36.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in Missouri.

37.     Defendant BASF Corporation is a Delaware corporation with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey.  BASF Corporation is the affiliate, subsidiary, agent, distributor and North American agent for BASF SE, a German company (hereinafter jointly referred to as "BASF").

38.     BASF cooperates and joint ventures with Monsanto in research, development and marketing of herbicides and weed control products, including Dicamba. In early 2009, Monsanto partnered with BASF, a German chemical company and the largest chemical producer in the world, and agreed to a joint licensing agreement to accelerate the development of dicamba-based weed control products.

39.     In the U.S., BASF Corporation, headquartered in Florham Park, New Jersey, is a wholly-owned and controlled American subsidiary of BASF SE, and manufactures several dicamba herbicides, including Banvel, Clarity, Distinct, Marksman, Status, and a forthcoming product, Engenia ™.

40.     Monsanto and BASF also have an established research and development collaboration to develop technologies for farmers – yet both companies intend to individually launch their own dicamba-based crop systems and herbicides.

41.     In November 2010, Monsanto and BASF stated they recently completed field testing of the dicamba-based herbicides. In tests, the dicamba herbicides were applied over-the top to Monsanto's Xtend products at Monsanto's research facility in Monmouth, Illinois.

42.     At least by 2012, weed scientists, agronomic crop growers, and specialty crop growers began warning consumers and growers alike of the danger of dicamba-resistant crops, including dicamba's propensity to drift onto sensitive, neighboring crops and how dicamba will accelerate the evolution of super weeds.

43.     Also in 2012, Monsanto submitted its petition to the EPA to register dicamba for in-crop use with cotton.

44.     In 2013, Monsanto submitted its application to deregulate dicamba for use with GM cotton.

45.     In June 2014, BASF announced plans to boost production of its dicamba weed killers by fifty percent (50%) to keep pace with anticipated demand should Monsanto receive regulatory approval to sell its new GM soybean and cotton products.

46.    Six months later, in January 2015, BASF's plan paid off when the USDA announced its decision (after a five-year investigation) to deregulate Monsanto's dicamba-tolerant crop technology for soybeans and cotton, authorizing the crops for unrestricted commercial planting.

47.    On December 21, 2016, BASF secured EPA approval for its dicamba herbicide, Engenia ™, for use on dicamba-tolerant soybeans and cotton. Engenia ™ will be available for the 2017 growing season.

48.    Entities or agents not named as Defendants have directly participated in the unlawful conduct and conspiracy alleged herein and have performed acts and made statements in furtherance thereof.

49.    While actively engaged in the management, direction or control of its affairs, each of the co-conspirators performed each of the acts alleged herein, or alternatively, each co-conspirator authorized or ordered duly authorized officers, agents, employees or representatives to perform said acts.

50.    Defendants are liable for unlawful acts performed in furtherance of the alleged conspiracy by companies acquired through mergers and acquisitions.

## FACTS

51.    A useful and marketable herbicide must be capable of suppressing growth of undesirable plants without materially adversely impacting human health or the environment, including desirable, non-target crops and plants.

52.    It is incumbent upon one who manufactures, formulates, packages or distributes a herbicide to be aware of its product's phytotoxic characteristics, both with

regard to the target plants as well as potential off-target plants, and to take appropriate actions to ensure that off-target plants are not collaterally injured with its use.

53.     Dicamba is a herbicide, often used to kill pigweed.  It is known to have negative effects on certain crops, including soybeans and watermelons.

54.     The dicamba-containing herbicides that were approved for use at all times relevant to this lawsuit were prone to drift.

55.     Defendants knew those older dicamba-containing herbicides were prone to drift.

56.     Monsanto designed, developed, marketed, distributed, and sold Round Up Ready 2 Xtend soybeans ("Xtend soybeans") and Bollgard II XtendFlex cotton seeds ("Xtend cotton") (collectively, "Xtend seeds").  Xtend seeds are currently resistant to the negative effects of dicamba-containing herbicides.

57.     At the time Defendants began selling Xtend seeds, and at all times relevant to this lawsuit, Monsanto was not selling an EPA-approved dicamba herbicide that was not prone to drift.

58.     Defendants marketed, distributed and sold Xtend seeds that contributed to the harm sustained by Plaintiffs.

59.     Northeastern Arkansas is one area where soybeans and watermelons have been significant crops for decades.

60.     Damage to off-target soybean and other crops has repeatedly been documented due to drift of dicamba-containing products in Arkansas, as well as other locations.  The use of dicamba-containing products has been restricted or prohibited in many locations where sensitive crops are grown.  The Defendants have therefore

known, or should have known, of dicamba's lack of selectivity and its extreme phytotoxicity to desirable non-target plants, and therefore, of the potential for collateral harm through drift of dicamba-containing products if applied in proximity to such crops. Despite such knowledge,

61.     Defendants have continued to market and sell Xtend seeds to farmers in Northeastern Arkansas and failed to warn or instruct or otherwise limit the use of dicamba-containing products either geographically or temporally so as to reasonably assure that harm would not occur to other crops growing in the region.

62.     Xtend seeds were approved for use by the Arkansas Plant Board.

63.     Defendants did not receive approval for any dicamba-containing herbicide for use with Xtend seeds.

64.     Nonetheless, Defendants encouraged farmers in Arkansas to plant Xtend seeds and use dicamba-containing herbicides made by companies other than Monsanto.  Defendants took these actions, knowing that dicamba-containing products would cause injury to crops grown from seeds other than Xtend seeds.

65.     The injury caused by exposure to dicamba-containing products resulted in financial losses to all Plaintiff farmers.  The proximate cause of the injury was the defective design, marketing, selling, and misbranding of Xtend seeds and their lack of suitability for the particular purpose for which they were sold in the area in question during the timeframe involved and a lack of merchantability.  Defendants were willful and negligent in their release, marketing, and selling of a defective crop system without an accompanying EPA-approved dicamba herbicide.

66.     Defendants have common-law and statutory duties to give reasonable and adequate warning of dangers reasonably foreseeable in the use of their productions to others, as well as such instructions as may be needed to make it reasonably likely that such harm will be avoided if followed.

67.     None of the labels for Defendants' products provide full, complete, and accurate information about the extreme toxicity of dicamba-containing products. None of Defendants' labels contain directions for use that, if complied with, are adequate to protect the environment, including Plaintiffs' crops. Defendants' labels do not and never have contained warning or caution statements that, if complied with, are adequate to protect the environment, including Plaintiffs' crops.

68.     The inherent, phytotoxic profile of dicamba-containing products cannot be applied with reasonable safety in northeastern Arkansas, using any typical or reasonably practical application techniques and conditions of use limitations, given the well-recognized nature and patterns of cultivation in that region, their regional proximity to one another, the foreseeable weather patterns in northeastern Arkansas and timing of likely application.   Accordingly, the Xtend seeds are defective as inherently posing an irreducible, unreasonable risk of harm to crops grown in the region that are not resistant to dicamba.

## CLASS ACTION ALLEGATIONS

69.     Plaintiffs bring this action on behalf of themselves individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the following defined class (the "Class"):

> All agriculture farmers and entities who raise non-dicamba-tolerant crops and suffered damage to those crops as a result of

Defendants' conspiracy and wrongful conduct or co-conspirators, or from any predecessors, parents, subsidiaries, or affiliates thereof, between 2014, and the present. Excluded from the Class are Defendants, co-conspirators, parent companies, predecessors, subsidiaries and affiliates, and all governmental entities.

70. Plaintiffs believe the approximate size of the Class to be in the thousands and so geographically dispersed throughout the United States that joinder of all class members is impracticable.

71. Plaintiffs' state law claims are typical of the claims of the Class and arise from the same conspiracy and unlawful conduct engaged in by Defendants and co-conspirators as alleged herein. The relief sought by the Plaintiffs is common to the entire class.

72. Numerous questions of fact or law arise from Defendants' and their co-conspirators' unlawful conduct, which is common, overarching and predominating to the class, including but not limited to:

a. Whether Defendants and their co-conspirators combined or conspired to control the non-dicamba-tolerant crop market and supply dicamba harmful to non-dicamba tolerant crops;

b. Whether Defendants and their co-conspirators engaged in unfair, false, deceptive or unconscionable behavior;

c. Whether Defendants and their co-conspirators conduct toward Plaintiffs and the Class was false, deceptive and unconscionable;

d. Whether Defendants and their co-conspirators were unjustly enriched by the sale of dicamba;

e. Whether the Plaintiffs and Class were injured by Defendants' and their co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members;

f. Whether Plaintiffs in the Affected States suffered crop damage from dicamba drift and volatilization when farmers and applicators applied dicamba to Monsanto's Xtend seeds;

g. Whether Defendants and their co-conspirators were negligent by developing, marketing, and selling dicamba-resistant seeds without a safe, approved herbicide;

h. Whether Defendants gave an adequate warning and instruction to purchasers and third-party purchasers of the dangers of dicamba-resistant seeds without a dicamba-based herbicide to be used in conjunction with one another;

i. Whether Defendants had a legal duty to innocent parties, including Plaintiffs, to use ordinary care to protect them against the unreasonable risk of harm of the inevitable spraying of old, volatile dicamba-based herbicides that would protect dicamba-resistant seeds;

j. Whether Defendants suppressed or concealed material facts about the safety of its Xtend Crop System, its risks to third parties, including Plaintiffs, that Defendants created a situation where illegal spraying was inevitable, and that

Defendants were well aware of the catastrophic damages that would occur third parties who did not by Xtend Products;

k. Whether Defendants were unjustly enriched at the expense of Plaintiffs;

l. Whether the Plaintiffs and Class are entitled to injunctive relief;

m. Whether punitive damages should be imposed upon Defendants for their conduct;

73. The questions of fact or law common to the Class are overarching and predominate as a threshold matter over any individual questions affecting members of the Class.

74. The Plaintiffs will fairly and adequately represent the interests of the Class and have no interest that is in conflict or antagonistic to the Class. Plaintiffs have retained counsel who are competent and experienced in agriculture, toxic torts, class action and complex litigation.

75. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the class as a whole.

76. A class action is procedurally superior to any alternatives for adjudicating the claims of the Plaintiffs and members of the Class. The claims of the members of the Class are small and can be consolidated into one lawsuit to decide the predominating issue of liability. Permitting this lawsuit to proceed utilizing the class mechanism will eliminate multiple litigation over the same

common issues of fact and liability and the probability of and risk of inconsistent decisions establishing varying standards of conduct for the Defendants. Maintenance of the lawsuit as a class action will promote judicial economy, efficiency and fairness to all parties involved.

## TRADE AND COMMERCE

77.     During the relevant time periods alleged herein, the Defendants and co-conspirators engaged in wrongful and unlawful conduct and control of the dicamba market affecting trade and commerce throughout the fifty (50) states, including this judicial district.

## FIRST CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY
## (Ark. Code § 4-86-102)

78.     Pursuant to Section 4-86-102 of the Arkansas Code, a supplier of a product is liable for harm to another person or his property if: (1) The supplier is engaged in the business of manufacturing, selling, or distributing the product; (2) The product was supplied by him in a defective condition that rendered it unreasonably dangerous; and (3) The defective condition was a proximate cause of the harm to person or to property.

79.     Each of the Defendants is engaged in the business of variously manufacturing, selling, and distributing Xtend seeds and is a "supplier" Xtend seeds for the purpose of Section 4-86-102 of the Arkansas Code.

80.     Xtend seeds are a defective product that cannot be used in a safe manner that prevents injury to non-target crops.  Each of the Defendants supplied Xtend seeds in a defective condition that rendered them unreasonably dangerous.

81.    The defective condition of Xtend seeds was a proximate cause of the harm to Plaintiffs.

82.    Each Defendant is strictly liable for all damages to each plaintiff proximately caused by Xtend seeds.

## SECOND CAUSE OF ACTION
## NEGLIGENCE

83.    Negligent Design: Each of the Defendants has a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm.  Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed in the subject area.  Each of the Defendants, therefore, failed to use ordinary care in the design and selection of materials in its products.  The negligent design and selection of materials was a proximate cause of the harm to Plaintiffs.  Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

84.    Negligent Testing: Each of the Defendants had a duty to test its products alone and in combination with dicamba-containing products that each of the Defendants recommended be used in order to determine the extent to which drift would injure off-target crops, and to provide such instructions and take other appropriate measures as are necessary to prevent such drift injuries.  Each of the Defendants failed to adequately test its products or to take appropriate steps to prevent such damage.  Each of the Defendants' negligent testing was a proximate cause of the harm to Plaintiffs.  Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

85.   <u>Inadequate Warning, Instruction, and Training</u>:  Defendants have a duty to give a reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of the product and to provide such instructions as are necessary to permit the reasonably safe use of the product.

86.   Monsanto sold its Xtend cotton and soybean seeds to farmers knowing that without a safe, approved herbicide alternative that there was a significant risk that farmers would use unapproved herbicides to protect their crops.

87.   Each of the Defendants violated its duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of their products, including the danger of causing significant and far-reaching off-target movement, migration and drift of dicamba-containing products in amounts that cause severe damage to crops other than those grown from Xtend seeds.

88.   Likewise, none of the product labels contain instruction for use that would, if followed, make it possible to use the Xtend seeds with a reasonable expectation that harm to collateral non-target crops would not be harmed.

89.   The inadequate warnings were a proximate cause of the harm to Plaintiffs. Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

90.   In addition to the foregoing negligence, the Defendants were negligent in distributing and selling Xtend seeds to the other Defendants without warning them of the impropriety of suggesting the use of dicamba-containing products without limitations or modifications to make its use reasonably safe or without agreed restrictions on the

products use so as to avoid it being sold into an area at a time where harm to sensitive crops would be likely to occur.

91.    The distributing Defendants were negligent in selling Xtend seeds in the subject area given that they knew or should have known that using dicamba-containing products posed an unreasonable risk of harm to nearby crops, given the physical proximity of the two crops, time of use, and the history of crop damage occurring in the area from the use of dicamba-containing products.

### THIRD CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY OF FITNESS
### FOR A PARTICULAR PURPOSE

92.    Each of the Plaintiffs has sustained damage due to Xtend seeds.

93.    Each Defendant knew that Xtend seeds would be used for the particular purpose of providing protection against dicamba-containing products.

94.    Each Defendant knew that farmers and the applicators who apply herbicides on behalf of farmers rely on the Defendants' skill and judgment to encourage the use of a suitable herbicide for weed control that will not damage off-target crops northeastern Arkansas, including adequate instructions and limitations on use, thereby impliedly warranting the product to be suitable for that particular purpose.

95.    Defendants' products as designed, manufactured and labeled, were not fit for the particular purpose for which they were required in that the product as designed, formulated and labeled posed an inherent risk to crops being grown in the region and the product therefore reached the implied warranty rendering Defendants liable to Plaintiffs for their damages arising from such harm.

96.     The unfitness of Defendants' products was a proximate cause of Plaintiffs' damages.

97.     Plaintiffs are people whom Defendants would reasonably have expected to be affected by Xtend seeds.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

98.     A seller impliedly warrants that a product is merchantable at the time the product is sold.  To be merchantable, a product must be fit for the ordinary purposes for which the product is used, and the product must be adequately labeled and must conform to any promises or affirmations of fact made on the container or label.

99.     Each of the Plaintiffs has sustained damage due to exposure to Xtend seeds.

100.    Each Defendant sold Xtend seeds, which were not merchantable in that the product as designed, formulated, and labeled posed an inherent risk to crops being grown in the region.

101.    The unfitness of Defendants' products was a proximate cause of Plaintiffs' damages.  Plaintiffs are people whom Defendants would reasonably have expected to be affected by Xtend seeds.

## FIFTH CAUSE OF ACTION
## ARKANSAS DECEPTIVE TRADE PRACTICES ACT
## (Ark. Code § 4-88-101, *et seq.*)

102.    Each of the Defendants is a "person" for the purposes of the Arkansas Deceptive Trade Practices Act pursuant to Ark. Code Ann. § 4-88-102(3).

103.    Xtend seeds constitute a "good" within the meaning of Ark. Code Ann. § 4-88-102(6).

104.   Pursuant to Arkansas Code Annotated section 4-88-108, it is unlawful for any person to use deception, fraud, or false pretense in, or to conceal, suppress, or omit material facts in connection with the sale or advertisement of goods, such as Xtend seeds.

105.   Pursuant to Arkansas Code Annotated section 4-88-107(a)(1), it is unlawful for any person to knowingly make false representations as to the characteristics of goods, such as Xtend seeds.

106.   Pursuant to Arkansas Code Annotated section 4-88-107(a)(10), it is unlawful in Arkansas to engage in an "unconscionable, false, or deceptive act or practice in business, commerce, or trade." Further, pursuant to Arkansas Code Annotated section 4-88-107(b), "[t]he deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

107.   Defendants engaged in unconscionable, false, and deceptive acts and practices in selling and labeling its product to imply that the product could safely be used in northeastern Arkansas, when each Defendant knew or should have known, if exercising ordinary care, that this was not the case.  Each Defendant also knew or should have known that the use of the product as labeled posed a risk to area crops that was beyond the control of the user, when following the label or other instructions.

108.   Defendants' customers, including Plaintiffs and members of the Class, were subjected to suppression, concealment and omission of material facts as a product of collusive, unlawful efforts by Defendants to control the market and suppress, conceal and omit from Plaintiffs, and others similarly situation, that their products posed

a risk to area crops that was beyond the control of the user, when following the label or other instructions.

109.    As a result of Defendants' fraudulent concealment of their conspiracy and unlawful, unconscionable, false, fraudulent, unfair and deceptive conduct directed toward Plaintiffs, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class members have as a result of the wrongful and unlawful conduct alleged in this complaint.

110.    Plaintiffs have a cause of action against each Defendant pursuant to Arkansas Code Annotated section 4-88-113 to recover their damages related to crop injury, as well as reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

111.    Before Defendants sold Xtend seeds, and during the entire time of the sale, Defendants knew the risks to third parties of illegal herbicide spraying.  Further, Defendants were aware that by selling Xtend seeds, they were creating a situation in which illegal spraying was almost certain.  Defendants were aware of the damages that would result to third parties because of this illegal spraying.

112.    Despite this knowledge, Defendants concealed these facts from farmers, federal and state regulatory bodies, farming associations, legislative bodies, the general public, and the Plaintiffs.

113.    The groups from which Defendants concealed these facts were unaware of them.

114.    The concealed information was material to all the groups described above.

115.   Defendants knew of the groups' ignorance of the truth and intentionally withheld the truth about Xtend seeds and their risks.

116.   As a result of the concealment of these facts, farmers purchased Xtend seeds and sprayed dicamba-containing herbicide, regulatory and legislative bodies were unable to protect the public, and Plaintiffs were harmed.

## SEVENTH CAUSE OF ACTION
### FRAUD

117.   The defendants made a false representation of material fact when they represented, advertised and promoted the sale and use of Xtend Seeds as a higher-yielding and safe soybean seed.

118.   Monsanto made a false representation of material fact when they represented, advertised and promoted the use of Xtend Seeds, knowing the dicamba-containing herbicide used in conjunction with the seeds would harm any crops that were not dicamba-resistant.

119.   Monsanto made a false representation of material fact when they represented, advertised and promoted the sale and use of Xtend Seeds for a higher yield, with the knowledge that the seeds would not produce a higher yield.

120.   Monsanto made a false representation of material fact when they secretly promoted the use of dicamba-containing herbicide with the knowledge that it had not been approved by the EPA.

121.   Monsanto made a false representation of material fact when they secretly promoted the use of dicamba-containing herbicide to farmers with the knowledge that it the herbicide was not approved by the Arkansas Plant Board for use in Arkansas.

122.   The farmers justifiably relied upon Monsanto's misrepresentations.

123.   Monsanto's misrepresentations substantially influenced the farmers to implement the Xtend crop system.

124.   The farmers' justifiable reliance on the misrepresentations by Monsanto and the distributors resulted in damages to valuable property and monetary damages.

125.   The farmers spent more money implementing a dangerous crop system that did not produce a higher yield of crops, resulting in monetary damages.

126.   The misrepresentations, which amount to fraud, has resulted in detriment and damages to both the farmers who planted the seeds and unsuspecting third-party farmers who did not implement the Xtend crop system.

## EIGHTH CAUSE OF ACTION
## UNJUST ENRICHMENT

127.   As a result of their illegal, deceptive, and tortious actions, Defendants have been enriched through the sale of Xtend seeds.

128.   By manipulating the public and marketing a product it knew to be unsafe for non-dicamba-resistant crops, Monsanto chose to enrich itself knowing such enrichment would result in the direct destruction of valuable property, including Plaintiffs'.

129.   Monsanto forced third parties to serve as an involuntary experimental testing ground for its new products. Monsanto thereby enriched itself by knowingly destroying the crops of innocent third parties, including Plaintiffs.

130.   Upon information and belief, Monsanto has unfairly and unjustly benefited and retained profits from the negligent and premature sale of Xtend Products as a direct result of Monsanto's tortious actions.

131.   The acceptance and retention of these profits is unjust because the profits are a direct benefit to Defendants as a result of their tortious conduct.

132.   Monsanto should be ordered to disgorge all unjust enrichment it has received to date and will receive for the next five (5) years from all sale of Xtend seeds.

## NINTH CAUSE OF ACTION
## CIVIL CONSPIRACY

133.   Monsanto, in a scheme to improperly market and expand the sales of its defective Xtend crop system, conspired with purchasers of Monsanto's Xtend seeds for the purchasers to illegally spray dicamba on the Xtend seeds.

134.   The object of the conspiracy was the unlawful marketing of Monsanto's defective Xtend crop system, the protection of its Xtend seeds and crops through the illegal spraying of dicamba-containing herbicides on those seeds and crops and a proliferation of its Xtend seeds through marketing to corner the market for genetically modified soybeans and cotton such that farmers in Arkansas would have no choice but to purchase Monsanto's Xtend seeds or risk destruction to their non-dicamba tolerant crops.

135.   Monsanto, through its agents and representatives, encouraged and directed its purchasers to illegally spray dicamba-based herbicides on the Xtend seeds to protect the seeds and crops.

136.   Numerous purchasers of Monsanto's Xtend seeds did unlawfully spray dicamba-containing herbicides on the Xtend seeds in furtherance of the conspiracy, including but not limited to violations of state statutes and regulations governing pesticide use.

137.    Monsanto's scheme to sell more Xtend seeds by harming those farmers that did not originally purchase the dicamba-resistant Xtend seeds caused severe and irreversible harm to the Plaintiffs' land, crops, and livelihoods.

138.    The unlawful actions of Monsanto and the purchasers of its Xtend seeds resulted in extensive damages to Plaintiffs for which the defendants should be held liable.

## CLASS ACTION PUNITIVE DAMAGES

139.    Defendants knew or should have known that their products are defective and misbranded.  Defendants knew or should have known that: (a) dicamba-containing products have a propensity to drift great distances in minute amounts, (b) that dicamba is severely phytotoxic to non-target crops, (c) that non-target are grown in the same vicinity in northeastern Arkansas as Xtend seeds, and (d) that dicamba has caused damage to crops in northeastern Arkansas in the past.  Despite this knowledge, each Defendant continued to manufacture, market, sell, supply, and distribute Xtend seeds, which constitutes a conscious disregard for the welfare of others and their property, from which malice and wanton or reckless disregard for public safety can be inferred.

## JURY TRIAL DEMANDED

140.    Plaintiffs respectfully demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully ask this Court:

a)      For an order certifying this lawsuit as a class action under Fed. R. Civ. P. rule 23, appointing counsel herein as class counsel and named Plaintiffs as class representatives.

b)      For a judgment for compensatory damages in accordance with the proof at trial;

c)      For a judgment for punitive damages;

d)      For Plaintiffs' costs, expert fees, disbursements and attorneys' fees incurred in prosecuting this action as permitted by statute, common benefit fund, common fund doctrine or other permissible law or doctrine;

e)      For disgorgement of profits that Defendants have received to date and will receive for the next five (5) years;

f)      For pre-judgment and post-judgment interest at the maximum lawful rate; and

g)      For such other relief as the Court deems just, necessary or proper.

Respectfully submitted,

**DUNCAN FIRM, P.A.**

By:    /s/ *Phillip Duncan*

Phillip Duncan, ABN #74039
Richard Quintus, ABN #2000078
William Rob Pointer, ABN #2007216
Timothy P. Reed, ABN #2012210
J. Reid Byrd, ABN #2016219
900 South Shackleford Road, Suite 725
Little Rock, Arkansas 72211
Telephone: 501-228-7600
Facsimile: 501-228-0415
phillip@duncanfirm.com
richard@duncanfirm.com
rob@duncanfirm.com
tim@duncanfirm.com
reid@duncanfirm.com

-and-

Paul Byrd, ABN #85020
Joseph Gates, ABN #2010239
**Paul Byrd Law Firm, PLLC**
415 N. McKinley St. Suite 210
Little Rock, Arkansas 72205
paul@paulbyrdlawfirm.com
joseph@paulbyrdlawfirm.com

-and-

Mr. Jerry Kelly, ABN #84085
**Kelly Law Firm, P.A.**
P.O. Box 500
Lonoke, AR 72086
jkelly@kellylawfirm.net