FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 3 1 2017

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

BRUCE FARMS PARTNERSHIP;                                    PLAINTIFFS
RONNIE BRUCE;
KAREN BRUCE;
KAREN BRUCE D/B/A BRUCE FARMS PARTNERSHIP;
CALEB BRUCE;
CURTIS NASH;
DENA NASH;
CURTIS & DENA NASH JV;
LA FARMS, INCORPORATED;
ERNEST HEIDELBERGER, INDIVIDUALLY AND AS
REPRESENTATIVE OF E & S HEIDELBERGER FARMS PARTNERSHIP;
SUSAN HEIDELBERGER, INDIVIDUALLY AND AS
REPRESENTATIVE OF E & S HEIDELBERGER FARMS PARTNERSHIP;
E & S HEIDELBERGER FARMS PARTNERSHIP;
WILLIAM E. MCMULLEN, INDIVIDUALLY AND AS
REPRESENTATIVE OF EDDIE MCMULLEN FARMS;
EDDIE MCMULLEN FARMS;
PHILLIP WADE HILL, INDIVIDUALLY AND AS
REPRESENTATIVE OF K AND W FARMS PARTNERSHIP;
K AND W FARMS PARTNERSHIP;
GARY GERLACH, INDIVIDUALLY AND AS
REPRESENTATIVE OF GERLACH FARMING;
KEVIN GERLACH, INDIVIDUALLY AND AS
REPRESENTATIVE OF GERLACH FARMING;
GERLACH FARMING;
FREDERICK AINSWORTH, INDIVIDUALLY AND AS
REPRESENTATIVE OF AINSWORTH FARMS PARTNERSHIP;
AINSWORTH FARMS PARTNERSHIP;
DAVID OAKES, INDIVIDUALLY AND AS
REPRESENTATIVE OF DAVID OAKES FARM;
DAVID OAKES FARM;
CHRIS OAKES, INDIVIDUALLY AND AS
REPRESENTATIVE OF CHRIS OAKES FARM;
CHRIS OAKES FARM;
JEREMY OAKES;
REED C STOREY;
RONALD CURTIS STOREY, INDIVIDUALLY AND AS
REPRESENTATIVE OF STOREY FARMING;
STOREY FARMING;
CHARLES P LOESCHNER;
CURTIS HEIDELBERGER, INDIVIDUALLY AND AS
REPRESENTATIVE OF C & A HEIDELBERGER FARMS;

AMY HEIDELBERGER VARELA, INDIVIDUALLY AND AS
REPRESENTATIVE OF C & A HEIDELBERGER FARMS;
C & A HEIDELBERGER FARMS;
PHILLIP JOE JACKSON II A/K/A and D/B/A JOE JACKSON;
WILLIAM MATTHEW DUNAVAN;
PHILLIP JACKSON;
STEPHEN DOUGLAS MEACHEM, INDIVIDUALLY AND AS
REPRESENTATIVE OF MEACHAM FARMS;
MEACHAM FARMS;
CARLOS NASH, INDIVIDUALLY AND AS
REPRESENTATIVE OF WATERFOWL FARMS, INCORPORATED
and GADWAL FARMS;
WATERFOOWL FARMS, INCORPORATED;
GADWAL FARMS;
ROBERT SHAUN BENNETT, INDIVIDUALLY AND AS
REPRESENTATIVE OF RSB FARMING;
KATHERINE BENNETT, INDIVIDUALLY AND AS
REPRESENTATIVE OF RSB FARMING;
RSB FARMING;
DARROW C LINN;
APRIL JOHNSON, INDIVIDUALLY AND AS
REPRESENTATIVE OF S & A FARMS;
LARRY JOHNSON, INDIVIDUALLY AND AS
REPRESENTATIVE OF S & A FARMS;
S & A FARMS;
CLINT HENDERSON, INDIVIDUALLY AND AS
REPRESENTATIVE OF HENDERSON LAND & CATTLE CO
and CLINT E HENDERSON LAND COMPANY;
HENDERSON LAND & CATTLE CO;
CLINT E HENDERSON LAND COMPANY;
LONNY W LOCKLEY, INDIVIDUALLY AND AS
REPRESENTATIVE OF LOCKLEY BROS FARM;
LONNY W LOCKLEY, JR. ("WES"), INDIVIDUALLY AND AS
REPRESENTATIVE OF LOCKLEY BROS FARM;
LOCKLEY BROS FARM;
JUDY A MINTON, INDIVIDUALLY AND AS
REPRESENTATIVE OF THE MORRIS IRREVOCABLE TRUST;
FRAN ADAMS, INDIVIDUALLY AND AS
REPRESENTATIVE OF THE MORRIS IRREVOCABLE TRUST;
THE MORRIS IRREVOCABLE TRUST;
LANCE HILL, INDIVIDUALLY AND AS
REPRESENTATIVE OF L & M FARM PARTNERSHIP;
L & M FARM PARTNERSHIP;
DANIEL HILL, INDIVIDUALLY AND AS
REPRESENTATIVE OF K D H FARMS PARTNERSHIP,
D. HILL & SONS FARM, LLC, and P & E FARMS, LLC;

K D H FARMS PARTNERSHIP;
D. HILL & SONS FARM, LLC;
P & E FARMS, LLC;
JAMES L HILL, INDIVIDUALLY AND AS
REPRESENTATIVE OF T HILL FARMS, HILL FARMS PARTNERSHIP,
and DWK FARMS, LLC;
T HILL FARMS;
HILL FARMS PARTNERSHIP;
DWK FARMS, LLC;
DAVID CARTER, INDIVIDUALLY AND AS
REPRESENTATIVE OF DAVID CARTER FARMS JV;
DAVID CARTER FARMS JV;
GEORGE WATSON, INDIVIDUALLY AND AS
REPRESENTATIVE OF WATSON PARTNERS;
WATSON PARTNERS;
BOBBY CLONINGER INDIVIDUALLY AND AS
REPRESENTATIVE OF BOBBY CLONINGER FARMS; and
BOBBY CLONINGER FARMS

vs.                                    Civil Case No. 3:17-cv-154-DPM

MONSANTO COMPANY;                                          DEFENDANTS
BASF SE;
BASF CORPORATION
BASF PLANT SCIENCE LP; and
JOHN DOE COMPANIES A - Z

### FIRST AMENDED COMPLAINT – CLASS ACTION

COMES NOW Plaintiffs, Bruce Farms Partnership, Ronnie Bruce, Karen Bruce, Caleb Bruce, Curtis Nash, Dena Nash, Curtis & Dena Nash JV, LA Farms, Incorporated, Ernest Heidelberger, Susan Heidelberger, E & S Heidelberger Farms Partnership, William E McMullen, Eddie McMullen Farms, Phillip Wade Hill, K and W Farms Partnership, Gary Gerlach, Kevin Gerlach, Gerlach Farming, Frederick Ainsworth, Ainsworth Farms Partnership, David Oakes, David Oakes Farm, Chris Oakes, Chris Oakes Farm, Billy Childers, Violet P. Childers, Childers Farm, Jeremy Oakes, Reed C Storey, Ronald Curtis Storey, Storey Farming, Charles P Loeschner, Curtis Heidelberger, Amy Heidelberger Varela, C & A Heidelberger Farms, Phillip Joe Jackson II a/k/a and d/b/a Joe Jackson, William Matthew Dunavan, Phillip Jackson, Stephen Douglas

Meachem, Meacham Farms, Carlos Nash, Waterfowl Farms, Incorporated, Gadwal Farms, Robert Shaun Bennett, Katherine Bennett, RSB Farming, Darrow C Linn, April Johnson, Larry Johnson, S & A Farms, Clint Henderson, Henderson Land & Cattle Co, Clint E Henderson Land Company, Lonny W Lockley, Lonny W Lockley, Jr. ("Wes"), Lockley Bros Farm, Judy A Minton, Fran Adams, The Morris Irrevocable Trust, Lance Hill, L & M Farm Partnership, Daniel Hill, K D H Farms Partnership, D. Hill & Sons Farm, LLC, P & E Farms, LLC, James L Hill, T Hill Farms, Hill Farms Partnership, DWK Farms, LLC, David Carter, David Carter Farms JV, George Watson, Watson Partners, Bobby Cloninger, and Bobby Cloninger Farms on behalf of themselves, all others similarly situated, and the class they seek to represent for their first Amended Complaint against the named Defendants herein, state as follows:

## I.   INTRODUCTION AND SUMMARY OF THE CLAIMS

1.     Plaintiffs bring this class action lawsuit for damages against Defendants, Monsanto and BASF, who jointly collaborated to develop and release a defective and unreasonably dangerous "dicamba-tolerant crop system," which has directly resulted in massive harm to crops in Arkansas, Missouri, Tennessee, Mississippi, and other states.

2.     These damages include, but are not limited to, crop damage, yield loss, total failure of the crop, and financial ruin to impacted farmers.

3.     The BASF/Monsanto dicamba-tolerant crop system cannot be safely used for its intended purpose regardless the degree of care without causing collateral damage to nearby crops, which are not part of the BASF/Monsanto dicamba-tolerant crop system.

4.     Dicamba is a synthetic herbicide, which farmers have been using for decades to burn down fields in an effort to control weeds. Due to the volatile nature of dicamba, farmers

could only use dicamba during certain times when no crops were in the ground, which had included before planting season began and after harvest was over.

5.      Despite knowledge of the dangers dicamba posed, Monsanto and BASF jointly collaborated, designed, formulated, developed, tested, manufactured, marketed, promoted, advertised, released, and created a dicamba-tolerant crop system designed to combine Monsanto's dicamba-resistant seeds (hereinafter "dicamba seed") with BASF's dicamba-based herbicide (hereinafter "Engenia®" or "Engenia"). This dicamba crop system is for an in-crop, over-the-top use, which is crop is emerging from the ground, for the first time ever to Arkansas' farmers and farmers across the country.

6.      Defendants have intricate knowledge of the agricultural process, including crops and herbicides.  With this superior knowledge of the agricultural production process and market domination, Defendants implemented, developed, and released their defective dicamba crop system on Arkansas' farmers.

7.      Monsanto identifies the dicamba-seed and dicamba-herbicides as a "crop system," meaning the dicamba-based herbicide, Engenia, and dicamba-seeds are specifically designed for use in conjunction with one another. Monsanto's website identifies dicamba-resistant seeds and the dicamba-based herbicides as a "crop system," also meaning the products should be used in conjunction with one another.

8.      This dicamba-tolerant crop system is inherently and unreasonably dangerous to nearby crops owned by farmers who did not purchase the dicamba seed.

9.      Defendants have long had knowledge and understanding of the physical characteristics, formulations, and properties of dicamba. Defendants created a "new formulation" of dicamba herbicide, which causes damage to neighboring crops because of its volatility, i.e.,

Page **5** of **75**

from vapor particles lifting into the atmosphere and moving away from the intended target. This off-target movement includes climatic inversions where vapor particles volatilize and become suspended in air and move to a non-dicamba-resistant crop area. Further, dicamba can move by wind drift, water run-off, and by particles attaching to dust and moving to a non-dicamba-resistant crop area. Thus, killing or damaging sensitive (non-dicamba-tolerant) crops.

10.     Defendants also knew the damaging nature and inherent danger of their genetically modified dicamba seed and dicamba herbicide, when joined together, formed a defective and unreasonably dangerous dicamba-tolerant crop system.

11.     At all relevant times, Defendants aggressively represented, marketed, advertised and promoted its "new" dicamba-resistant crop system as safe, including, "safety to nearby crops." BASF and Monsanto, in a joint press release, stated, "Both parties will participate in the development of innovative formulations for dicamba for use with herbicide-resistant cropping systems…Improved formulations are being developed to complement this new combination of herbicide-resistant crops." Despite Defendants' representations, marketing, advertising and promotion to the contrary, Defendants' dicamba-tolerant crop system has caused massive crop damage to farmers, including Plaintiffs.

12.     Defendants knew soybeans are highly sensitive to extremely low doses of dicamba. Dicamba had been available for 50 years for corn, small grain, and pastures. However, dicamba was not applied to soybeans over-the-top. Thus, Defendants new formulation was a whole new introduction, not only in mass, but to a crop that is highly sensitive to dicamba. Therefore, nearby crops, were imminently at risk when the dicamba-tolerant crop system was introduced.

13.     Plaintiffs bring this nationwide class action on behalf of farmers whose crops have been materially and significantly damaged by Defendants' negligent control, testing, training,

development, marketing, promotion, advertising, and distribution of the dicamba crop system, which proximately caused significant and material injury and damage to Plaintiffs' crops in 2016 and 2017.

14. Plaintiffs further bring this nationwide class action on behalf of farmers who have been forced to buy dicamba-resistant seed products from Separate Defendant Monsanto Company as a defense mechanism to prevent damage to the farmers crop due to volatility and drift of Dicamba.

15. Because of Defendants' willful conduct, Plaintiffs' crops are not resistant to dicamba and have been devastated by dicamba damage due to the spraying of volatile, drift-prone dicamba over dicamba-tolerant products. Accordingly, Plaintiffs bring their lawsuit under state law claims of (1) strict products liability; (2) negligence; (3) breach of implied warranty of fitness for a particular purpose; 4) breach of implied warranty of merchantability (5) express warranty; (6) misrepresentation, fraud & deceit; (7) Arkansas Deceptive Trade Practices Act (8) unjust enrichment; and (9) civil conspiracy.

16. Plaintiffs seek relief in the form of compensatory damages, punitive damages, and attorneys' fees and other costs of litigation.

## II.   JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this lawsuit pursuant to U.S.C. § 1332(d) because there is complete diversity of parties. Plaintiffs individually also seek more than $75,000 for damages, punitive damages and also injunctive relief.

18. Plaintiffs are residents and citizens of Arkansas who have property affected by Defendants' conduct and represent similarly situated injured persons and entities from various state injured by Defendants uniform corporate conduct and partnership in the release of an

inherently dangerous and volatile crop-system on the market, which has directly impacted and severely damaged Plaintiffs' livelihood of growing crops.

19.     At all relevant times herein, Defendants have jointly researched, designed, formulated, compounded, developed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, promoted, packaged, advertised and made representations regarding dicamba-resistant crops and dicamba herbicide.

20.     This Court has both specific and general personal jurisdiction over the parties. Defendants have engaged in such continuous, systematic and continually conduct business in the State of Arkansas that the Defendants are "at home" in the State of Arkansas.  Defendants actively engaged in the promotion and use of their inherently dangerous and volatile crop-system in Arkansas, Missouri, Mississippi and other states, have distributed dicamba herbicide applicators and have performed training, education and information schools in Arkansas, Missouri and Mississippi and other states. Defendants have performed GMO crop and dicamba-resistant crops and dicamba herbicide testing on test plots in the State of Arkansas, avail themselves of the opportunity to conduct business in this State, sell crop products, make representations, market, advertise, promote and distribute their crop products in this State and have committed tortious acts in the State of Arkansas.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because (1) Plaintiffs reside in this District; (2) Defendants have engaged in substantial conduct and business relevant to Plaintiffs' claims within this District; and (3) Plaintiffs have suffered substantial losses from dicamba herbicides due to Defendants' wrongful conduct within this District.

## III.   PARTIES

22.   Plaintiff Karen Bruce, Individually and as Representative of Bruce Farms Partnership and Karen Bruce d/b/a Bruce Farms Partnership, farms soybeans in Craighead County, Arkansas and Dunklin County, Mississippi.

23.   Plaintiff Ronnie Bruce, Individually and as Representative of Bruce Farms Partnership, farms soybeans in Craighead County, Arkansas and Dunklin County, Mississippi.

24.   Plaintiff Bruce Farms Partnership farms soybeans in Craighead County, Arkansas and Dunklin County, Mississippi.

25.   Plaintiff Karen Bruce d/b/a Bruce Farms Partnership farms soybeans in Craighead County, Arkansas and Dunklin County, Mississippi.

26.   Plaintiff Caleb Bruce farms soybeans in Craighead County, Arkansas.

27.   Plaintiff Curtis Nash, Individually and as Representative of Curtis and Dena Nash JV and LA Farms Inc., farms soybeans in Monroe County, Arkansas.

28.   Plaintiff Dena Nash, Individually and as Representative of Curtis and Dena Nash JV and LA Farms Inc., farms soybeans in Monroe County, Arkansas.

29.   Plaintiff Curtis and Dena Nash JV farms soybeans in Monroe County, Arkansas.

30.   Plaintiff LA Farms Inc. farms soybeans in Monroe County, Arkansas.

31.   Plaintiff Ernest Heidelberger, Individually and as Representative of E & S Heidelberger Farms Partnership, farms soybeans in Lee County, Arkansas and Phillips County, Arkansas.

32.   Plaintiff Susan Heidelberger, Individually and as Representative of E & S Heidelberger Farms Partnership, farms soybeans in Lee County, Arkansas and Phillips County, Arkansas.

33.     Plaintiff E & S Heidelberger Farms Partnership farms soybeans in Lee County, Arkansas and Phillips County, Arkansas.

34.     Plaintiff William E McMullen, Individually and as Representative of Eddie McMullen Farms, farms soybeans in Prairie County, Arkansas.

35.     Plaintiff Eddie McMullen Farms farms soybeans in Prairie County, Arkansas.

36.     Plaintiff Phillip Wade Hill, Individually and as Representative of K and W Farms Partnership, farms soybeans in Desha County, Arkansas.

37.     Plaintiff K and W Farms Partnership farms soybeans in Desha County, Arkansas.

38.     Plaintiff Gary Gerlach, Individually and as Representative of Gerlach Farming, farms soybeans in Monroe County, Arkansas.

39.     Plaintiff Kevin Gerlach, Individually and as Representative of Gerlach Farming, farms soybeans in Monroe County, Arkansas.

40.     Plaintiff Gerlach Farming farms soybeans in Monroe County, Arkansas.

41.     Plaintiff Frederick Ainsworth, Individually and as Representative of Ainsworth Farms Partnership, farms soybeans in Mississippi County, Arkansas.

42.     Plaintiff Ainsworth Farms Partnership farms soybeans in Mississippi County, Arkansas.

43.     Plaintiff David Oakes, Individually and as Representative of David Oakes Farm, farms soybeans in Mississippi County, Arkansas.

44.     Plaintiff David Oakes Farm farms soybeans in Mississippi County, Arkansas.

45.     Plaintiff Chris Oakes, Individually and as Representative of Chris Oakes Farm, farms soybeans in Mississippi County, Arkansas.

46.     Plaintiff Chris Oakes Farm farms soybeans in Mississippi County, Arkansas.

47.     Plaintiff Billy Childers, Individually and as Representative of Childers Farm, farms soybeans in Mississippi County, Arkansas.

48.     Plaintiff Violet P. Childers, Individually and as Representative of Childers Farm, farms soybeans in Mississippi County, Arkansas.

49.     Plaintiff Childers Farm farms soybeans in Mississippi County, Arkansas.

50.     Plaintiff Jeremy Oakes farms soybeans in Mississippi County, Arkansas.

51.     Plaintiff Reed C Storey farms soybeans in Phillips County, Arkansas.

52.     Plaintiff Ronald Curtis Storey, Individually and as Representative of Storey Farming, farms soybeans in Lee County, Arkansas and Phillips County, Arkansas.

53.     Plaintiff Storey Farming farms soybeans in Lee County, Arkansas and Phillips County, Arkansas.

54.     Plaintiff Charles P Loeschner farms soybeans in Phillips County, Arkansas.

55.     Plaintiff Curtis Heidelberger, Individually and as Representative of C & A Heidelberger Farms, farms soybeans in Jefferson County, Arkansas and Phillips County, Arkansas.

56.     Plaintiff Amy Heidelberger Varela, Individually and as Representative of C & A Heidelberger Farms, farms soybeans in Jefferson County, Arkansas and Phillips County, Arkansas.

57.     Plaintiff C & A Heidelberger Farms farms soybeans in Jefferson County, Arkansas and Phillips County, Arkansas.

58.     Plaintiff Phillip Joe Jackson II a/k/a and d/b/a Joe Jackson farms soybeans in Arkansas County, Arkansas and Monroe County, Arkansas.

59.     Plaintiff William Matthew Dunavan farms soybeans in Monroe County, Arkansas.

60.     Plaintiff Phillip Jackson farms soybeans in Monroe County, Arkansas.

61.    Plaintiff Stephen Douglas Meachem, Individually and as Representative of Meacham Farms, farms soybeans in Monroe County, Arkansas.

62.    Plaintiff Meacham Farms farms soybeans in Monroe County, Arkansas.

63.    Plaintiff Carlos Nash, Individually and as Representative of Waterfowl Farms, Incorporated and Gadwal Farms, farms soybeans in Monroe County, Arkansas.

64.    Plaintiff Waterfowl Farms, Incorporated farms soybeans in Monroe County, Arkansas.

65.    Plaintiff Gadwal Farms, Incorporated farms soybeans in Monroe County, Arkansas.

66.    Plaintiff Robert Shaun Bennett, Individually and as Representative of RSB Farming, farms soybeans in Monroe County, Arkansas.

67.    Plaintiff Katherine Bennett, Individually and as Representative of RSB Farming, farms soybeans in Monroe County, Arkansas.

68.    Plaintiff RSB Farming farms soybeans in Monroe County, Arkansas.

69.    Plaintiff Darrow C Linn farms soybeans in Lee County, Arkansas, and St. Francis County, Arkansas.

70.    Plaintiff April Johnson, Individually and as Representative of S & A Farms, farms soybeans in Monroe County, Arkansas.

71.    Plaintiff Larry Johnson, Individually and as Representative of S & A Farms, farms soybeans in Monroe County, Arkansas.

72.    Plaintiff S & A Farms farms soybeans in Monroe County, Arkansas.

73.    Plaintiff Clint Henderson, Individually and as Representative of Henderson Land & Cattle Co and Clint E Henderson Land Company, farms soybeans in Jefferson County, Arkansas and Lonoke County, Arkansas.

74.     Plaintiff Henderson Land & Cattle Co farms soybeans in Jefferson County, Arkansas and Lonoke County, Arkansas.

75.     Plaintiff Clint E Henderson Land Company farms soybeans in Jefferson County, Arkansas.

76.     Plaintiff Lonny W Lockley, Individually and as Representative of Lockley Bros Farm, farms soybeans in Crittenden County, Arkansas and St. Francis County, Arkansas.

77.     Plaintiff Lonny W Lockley, Jr. ("Wes"), Individually and as Representative of Lockley Bros Farm, farms soybeans in Crittenden County, Arkansas and St. Francis County, Arkansas.

78.     Plaintiff Lockley Bros Farm farms soybeans in Crittenden County, Arkansas and St. Francis County, Arkansas.

79.     Plaintiff Judy A. Minton, Individually and as Representative of The Morris Irrevocable Trust, farms soybeans in Lonoke County, Arkansas.

80.     Plaintiff Fran Adams, Individually and as Representative of The Morris Irrevocable Trust, farms soybeans in Lonoke County, Arkansas.

81.     Plaintiff The Morris Irrevocable Trust farms soybeans in Lonoke County, Arkansas.

82.     Plaintiff Lance Hill, Individually and as Representative of L & M Farm Partnership, farms soybeans in Desha County, Arkansas and Lincoln County, Arkansas.

83.     Plaintiff L & M Farm Partnership farms soybeans in Desha County, Arkansas and Lincoln County, Arkansas.

84.     Plaintiff Daniel Hill, Individually and as Representative of K D H Farms Partnership, D. Hill & Sons Farm, LLC, and P & E Farms, LLC, farms soybeans in Desha County, Arkansas and Lincoln County, Arkansas.

85.     Plaintiff K D H Farms Partnership farms soybeans in Desha County, Arkansas and Lincoln County, Arkansas.

86.     Plaintiff D. Hill & Sons Farm, LLC farms soybeans in Desha County, Arkansas.

87.     Plaintiff P & E Farms, LLC farms soybeans in Desha County, Arkansas.

88.     Plaintiff James L Hill, Individually and as Representative of T Hill Farms, Hill Farms Partnership, and DWK Farms, LLC farms soybeans in Desha County, Arkansas.

89.     Plaintiff T Hill Farms farms soybeans in Desha County, Arkansas.

90.     Plaintiff Hill Farms Partnership farms soybeans in Desha County, Arkansas.

91.     Plaintiff DWK Farms, LLC farms soybeans in Desha County, Arkansas.

92.     Plaintiff David Carter, Individually and as Representative of David Carter Farms JV, farms soybeans in Lonoke County, Arkansas and Pulaski County, Arkansas.

93.     Plaintiff David Carter Farms JV farms soybeans in Lonoke County, Arkansas and Pulaski County, Arkansas.

94.     Plaintiff George Watson, Individually and as Representative of Watson Partners, farms soybeans in Crittenden County, Arkansas.

95.     Plaintiff Watson Partners farms soybeans in Crittenden County, Arkansas.

96.     Plaintiff Bobby Cloninger, Individually and as Representative of Bobby Cloninger Farms, farms soybeans in Lonoke County, Arkansas.

97.     Plaintiff Bobby Cloninger Farms farms soybeans in Lonoke County, Arkansas.

98. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri, 800 N Lindbergh Blvd, Saint Louis, MO 63167.

99. Defendant BASF, SE, a German company, has its headquarters at Ludwigshafen, Germany. BASF states that "[with an area of approximately ten square kilometres, the Ludwigshafen Verbund site is the world's largest integrated chemical complex."

100. Defendant BASF Corporation is a Delaware corporation with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey. Defendant BASF Corporation is the affiliate, subsidiary, agent, distributor and North American agent for BASF SE, a German company (hereinafter jointly referred to as "BASF").

101. Defendant BASF Plant Science LP ("BASF Plant Science") is a subsidiary of BASF, SE. Its corporate office is located at 100 Campus Drive, Florham Park, New Jersey 07932. Its registered agent is CT Corporation System, 160 Mine Lake CT, Suite 200, Raleigh, North Carolina 27615-6417.

102. BASF Plant Science LP is a partner with BASF Corporation and conducts research on herbicides and genetically modified organisms. BASF Plant Science is a subsidiary of BASF in which all plant biotechnology activities are consolidated. The GmbH was founded in 1998 and employs approximately 700 people at 6 different locations worldwide.

103. The headquarters of BASF Plant Science is located in Research Triangle Park (North Carolina). Plant Science has research sites in the US, Canada and Europe. At these locations, the company is mainly developing genetically modified seeds.

104. BASF Plant Science genetically modified crops like maize, soy, cotton, canola, sugarcane, sugar beet and potatoes "for a more efficient agriculture". Together with subsidiaries

and partners, as well as in cooperation with universities and research institutions, BASF Plant Science is also developing new procedures and practices in genetic technology.

105.    Genetically modified crops by BASF are sold and distributed through biotechnology companies like Monsanto, KWS Saat, Embrapa, or CTC (Centro de Tecnologia Canavieira).

106.    BASF also has an extensive agricultural herbicide presence in Missouri, including large agricultural chemical facility in Hannibal (Palmyra), Marion County, Missouri, which produces agricultural chemicals, including KIXOR® Herbicide, PROWL® Herbicide, PROWL H2O® Herbicide PURSUIT® Herbicide, RAPTOR® Herbicide, ARSENAL® Herbicide, CADRE® Herbicide, PHANTOM® Herbicide, EXTREME® Herbicide and BASAGRAN® Herbicide.

107.    The Hannibal Missouri BASF agricultural herbicide manufacturing facility started production in 1966. The facility is located on Route JJ, 10 miles north of Hannibal on Route 168 and 6 miles south of Palmyra and U.S. 61. It has 4 Active Ingredient Manufacturing and 1 Formulation Packaging plants at the Hannibal Missouri site. It employs 347 employees.

108.    At all relevant times herein, Defendants acted together, and in-concert, as agents, joint-venturers, joint-enterprises, partners and co-conspirators with sharing of proprietary genetically modified crop traits, field testing, training of farmers and other shared corporate conduct, including joint promotion and financial benefits from their shared corporate conduct, with each other's actions directed toward the purpose or releasing an inherently dangerous, unsafe and volatile crop system, thereby imputing each other's conduct to one another.

## IV. FACTS

109.    A useful and marketable herbicide must be capable of suppressing growth of undesirable plants without materially adversely impacting human health or the environment, including desirable, non-target crops and plants.

110.    It is incumbent upon one who manufactures, formulates, packages or distributes an herbicide to be aware of its product's phytotoxic characteristics, both with regard to the target plants as well as potential off-target plants, and to take appropriate actions to ensure that off-target plants are not collaterally injured with its use.

111.    Dicamba is an herbicide, often used to kill palmer amaranth (commonly referred to as "pigweed"). It is known to have extremely negative effects on certain crops, including but not limited to, soybeans.

112.    The dicamba-based herbicides that were approved for use at all times relevant to this lawsuit were volatile and prone to drift or inversion.

113.    Monsanto designed, developed, marketed, distributed, and sold Round Up Ready 2 Xtend soybeans and Bollgard II XtendFlex cotton seeds (collectively, "dicamba seed(s)"). Dicamba seeds are currently resistant to the negative effects of dicamba-containing herbicides.

114.    The cultural environment of the agricultural industry involves agreements between seed manufacturers/distributors and consumers to protect special, proprietary, patented technology of genetically modified organisms and herbicides, in which the Defendants' have significant and substantial monetary interests. Monsanto has intervened in multiple lawsuits to protect their interests in their patented technology.

115. At the time Defendants began selling dicamba seeds, Defendants were not selling an EPA-approved dicamba herbicide that was not prone to drift or volatilization and off-target vapor movement.

116. In 2017, Defendants knew dicamba bases, such as Engenia, are highly volatile relative to other herbicides and prone to off-target movement, which can cause damage to sensitive (non-dicamba-tolerant crops), particularly soybeans and other crops highly sensitive to dicamba.

117. Defendants marketed, distributed and sold the dicamba-tolerant crop system that contributed to the harm sustained by Plaintiffs.

118. Northeastern Arkansas is one area where soybeans and watermelons have been significant crops for decades.

119. Damage to off-target soybean and other crops has repeatedly been documented due to drift of dicamba-containing products in Arkansas, as well as other states. The use of dicamba-containing products has been restricted or prohibited in many locations where sensitive crops are grown. The Defendants have therefore known, or should have known, of dicamba's lack of selectivity and its extreme phytotoxicity to desirable non-target plants, and therefore, of the potential for collateral harm through drift of dicamba-containing products if applied in proximity to such crops.

120. Despite such knowledge, Defendants have continued to market and sell dicamba seeds to farmers in Northeastern Arkansas and failed to warn or instruct or otherwise limit the use of dicamba-containing products either geographically or temporally so as to reasonably assure that harm would not occur to other crops growing in the region.

121. For Crop Year 2016, dicamba seeds were approved for use by the Arkansas Plant Board.

122. In 2016, Separate Defendant, Monsanto did not receive approval for any dicamba-containing herbicide for use with dicamba seeds. Yet, Monsanto rushed its crop-system forward even publicly commenting that it may "pre-order" reservations for its dicamba system and announced it would begin selling soybeans irrespective of EPA approval.

123. At this same time, Defendants suppressed, withheld and concealed critical, material facts from regulatory authorities regarding its lack of testing on volatility of its products. Monsanto relied on misleading volatility testing and did not allow independent and unbiased tests on volatilization despite receiving multiple requests. When specifically confronted about this testing validity issue on August 8, 2016, Boyd Carey, a Monsanto representative, stated to the Arkansas State Plant Board such tests would *not* be allowed because the results might jeopardize Monsanto's registrations of its products, therefore, delaying regulatory approval of the dicamba-tolerant crop system.

124. Nonetheless, without approval for Monsanto's dicamba-based herbicide in 2017, Defendants encouraged farmers in Arkansas to plant dicamba-tolerant crops and use dicamba-containing herbicides made by companies other than Monsanto, namely BASF's Engenia.

125. Defendants took these actions, knowing that dicamba-containing products would cause injury to crops grown from any other technology other than dicamba-tolerant crops.

126. The injury caused by exposure to dicamba-containing products resulted in financial losses to all Plaintiff farmers. Injury from non-target injury is uniform from the inherently dangerous volatility of Defendants' crop system.

127. The proximate cause of the injury was the defective design, marketing, selling, and misbranding of dicamba seeds and their lack of suitability for the particular purpose for which they were sold in the area in question during the timeframe involved and a lack of merchantability.

Defendants were willful and negligent in their premature release, marketing, and selling of a defective crop system without an accompanying EPA-approved dicamba herbicide.

128.    Defendants were further willful and negligent in rushing the dicamba-tolerant crop system to market without adequate testing in the southern states for volatility and known inversion situations with dicamba in different environmental conditions.

129.    In 2017, Defendants were further willful and negligent for warranting, assuring, promising and representing the "new formulation" of dicamba and dicamba-tolerant crop system as safe for neighboring crop systems in a marketplace controlled by Defendants so as to advance an unsafe and inherently dangerous product to the marketplace to enhance revenue.

130.    Defendants have common-law and statutory duties to give reasonable and adequate warning of dangers reasonably foreseeable in the use of their productions to others, as well as such instructions as may be needed to make it reasonably likely that such harm will be avoided if followed.

131.    None of the labels for Defendants' products provide full, complete, and accurate information about the extreme toxicity of dicamba-containing products.

132.    None of Defendants' labels contain directions for use that, if complied with, are adequate to protect the environment, including Plaintiffs' crops. Defendants' labels do not and never have contained warning or caution statements that, if complied with, are adequate to protect the environment, including Plaintiffs' crops.

133.    Moreover, Defendants made false, deceptive, misleading statements of material fact about the safety of their dangerous product with knowledge that their statements and representations would be relied upon in a marketplace they control and their product

would be purchased en masse, thus, creating large areas of harm to those farmers who did not purchase dicamba-tolerant crop seeds or plant dicamba-tolerant crops.

134.   Defendants sold such GMO products and crop-systems through their partnership and agreement with the knowledge and intent that farmers who were injured would have no alternative, but purchase their products and crop-system (as a defense) to avoid their crop from being ruined, thus further enhancing Defendants' revenue and complete control of the marketplace for dicamba-tolerant soybeans and crop systems and control and domination of the soybean and cotton markets.

135.   Such unlawful conspiracy was made with their superior knowledge of the GMO crop system and volatility of its modified dicamba formulations and with their intent to obtain billions in revenue from sales of its dicamba-tolerant crop system.

136.   Defendants, as a part of an agreement, scheme and device, intentionally, willfully and wantonly suppressed, concealed and omitted material facts when they knew their products were unsafe, hazardous and dangerous to non-dicamba tolerant crops, but with this knowledge proceeded with distributing, selling, wholesaling, promoting, marketing, advertising, warranting and assuring farmers and the public that its new dicamba-tolerant products and crop system were safer for nearby crops even though they had knowledge that its system was not safe and would cause harm, thus, perpetuating a system where harmed farmers would purchase their products (play defense farming) to avoid crop damage and financial ruin.

137.   The inherent, phytotoxic profile of dicamba-containing products cannot be applied with reasonable safety in any area, particularly in northeastern Arkansas, using any typical or reasonably practical application techniques and conditions of use limitations, given

the well-recognized nature and patterns of cultivation in that region, their regional proximity to one another, the foreseeable weather patterns and timing of likely application. Accordingly, the dicamba-tolerant crop system is defective as inherently posing an irreducible, unreasonable risk of harm to crops grown in the regions that are not resistant to dicamba.

138. Defendants' dicamba-tolerant seed and herbicides are inherently dangerous, volatile, hazardous and unsafe for neighboring crops resulting in direct harm to Plaintiffs and similarly situated farmers, persons and entities who have experienced crop damage due to Defendants' products placed in the marketplace.

## A. RELEVANT HISTORY OF DICAMBA AND DICAMBA-TOLERANT CROPS

139. BASF represents the history of dicamba as follows:



140. Dicamba is a broad-spectrum, synthetic auxin herbicide that kills broad-leafed weeds before and after they sprout by increasing a plant's growth rate so the plant outgrows its nutrient supply and dies.

141. Dicamba is extremely toxic to virtually all broadleaf plants (plants that are not grasses), such as fruits, nuts, vegetables, and it is especially toxic to soybeans and cotton due to the extreme sensitivity to conventional (non-dicamba-tolerant) soybeans and cotton.

Page **22** of **75**

142.     Before the BASF and Monsanto partnership and joint venture, the permitted use of dicamba was solely for the purpose as a pre-emergent and post-harvest burndown application, never for in-crop, over-the-top use.

143.     In April 2010, Defendant Monsanto made its first submission to the EPA to register dicamba formulations for a new use in conjunction with genetically modified, "dicamba-tolerant" soybeans.

144.     In 2012, Defendant Monsanto submitted its petition to the EPA to register dicamba for in-crop, over-the-top, use with Monsanto's corresponding Xtend cotton seeds.

145.     In January 2015, the U.S. Department of Agriculture ("USDA") announced its decision (after a five-year investigation) to deregulate Defendant Monsanto's dicamba-tolerant crop technology for soybeans and cotton, authorizing the crops for unrestricted commercial planting.

146.     When BASF was registering Engenia, the EPA stated, "Registration is in no way to be construed as an endorsement or recommendation of this product by the Agency."

147.     Before the approvals in 2016, the EPA had stated, "Current allowable uses for dicamba products are restricted to ***pre-plant and post-harvest burndown applications***." The EPA also stated: "***Dicamba is a highly volatile herbicide prone to move off target by the way of drift or through vapor volatility.***"

148.     On December 20, 2016, BASF received conditional approval for two years for Engenia.

149.     On December 21, 2016, BASF secured EPA approval for its dicamba herbicide, Engenia, for use on dicamba-tolerant soybeans and cotton.

150.   Following approval, BASF began to market, distribute, and sell Engenia at enormous rates for the 2017 growing season.

**B. BASF AND MONSANTO'S DICAMBA-TOLERANT CROP PARTNERSHIP**

151.   BASF has a partnership, joint-enterprise and joint venture with Monsanto in research, development, and marketing of herbicides and weed control products, including dicamba products. BASF and Monsanto have formally collaborated with each other since 2005 regarding genetically modified crops and herbicides.

152.   In the 1980's, Sandoz Agro, Inc. (hereinafter "Sandoz"), had been studying strains of bacteria regarding dicamba and dimethylene.

153.   During the 1980's, Donald P. Weeks, a biochemist worked at Sandoz in researching and developing bacteria, namely D1-6, that could degrade dicamba in a plant fast enough where the plant would survive, but the surrounding weeds would die.

154.   In 1989, Dr. Weeks left Sandoz and became an employee at the University of Nebraska-Lincoln. At the University of Nebraska-Lincoln, Dr. Weeks served as the Director of the Center for Biotechnology Research from 1989 through 1997.

155.   More fully detailed herein, from 1993 to 1997, the University of Nebraska-Lincoln and Sandoz Ltd. jointly researched and developed dicamba degrading enzymes to be used as trait technology to develop dicamba-tolerant crops.

156.   In February of 1993, Sandoz entered into an agreement with the University of Nebraska-Lincoln for a project titled, "GENETIC ENGINEERING OF SOYBEAN PLANTS FOR LOWER COST WEED CONTROL."

157.   The agreement between Sandoz and the University of Nebraska-Lincoln required Sandoz to fund research to support the development of dicamba-tolerant crops.

158.   The research sought to incorporate genes which encode enzymes for dicamba inactivation into dicamba sensitive plants to provide the genetically modified plants with protection against the harmful herbicidal activity of dicamba.

159.   The ultimate goal of the research was to develop fast-acting dicamba-degrading-enzymes in order to develop transgenic dicamba-tolerant plants.

160.   In an effort to facilitate the research, Sandoz provided D1-6 bacterium, which Dr. Weeks worked with during his employment with Sandoz, and permitted the University of Nebraska-Lincoln to use D1-6 in the joint research.

161.   In April of 1995, the University of Nebraska-Lincoln requested more funding for Sandoz, which extended the joint research contract to March 1, 1996.

162.   In January of 1996, the University of Nebraska-Lincoln again received additional funding from Sandoz to extend the joint research contract from March 1, 1996 to March 1, 1997, for completion of the research.

163.   On September 26, 1996, Sandoz Ltd., entered into an Asset Purchase Agreement (hereinafter "Sale") with BASF Aktiengesellschaft regarding Sandoz's line of dicamba technology.

164.   The Sale included in section "(c) Dicamba" that "all the Seller's and the Subsidiaries' right, title and interest in and to United States and Canada patents for dicamba-based products...including patents and any patent applications...."

165.   The Sale further included, "all the Seller's and Subsidiaries' right, title and interest in and to production and formulation know-how for dicamba and dicamba-based products..." as well as, "...trademarks and servicemarks for dicamba and dicamba-based products...."

166.   On November 17, 2004, the Board of Regents of the University of Nebraska-Lincoln filed a Complaint against BASF Corporation seeking declaration "that BASF does not possess any right, title, or interest in a non-exclusive license to make, have made, use, or sell inventions, including know-how and resulting patents, in certain technology developed by the University with funding from Sandoz Agro, Inc."

167.   On January 12, 2005, the University of Nebraska-Lincoln and Monsanto Company entered in to an agreement regarding the "exclusive license of certain patent rights owned by" the University.

168.   Specifically, the agreement between the University of Nebraska-Lincoln and Monsanto Company covered "U.S. and foreign patent applications which have patent claims which would, if issued, cover the making or reproduction of transgenic organisms, including plants, which exhibit resistance to dicamba herbicide."

169.   On March 23, 2005, Monsanto released a press release stating, "Biochemist Don Weeks and colleagues identified a gene that can make dicamba-sensitive crops such as soybeans tolerant to the widely used herbicide. The university has several patents pending on this discovery." - <http://news.monsanto.com/press-release/monsanto-unl-sign-agreement-develop-dicamba-tolerant-crops>.

170.   On January 25, 2006, Monsanto intervened in the University of Nebraska-Lincoln/BASF lawsuit, requesting the court to declare the University of Nebraska-Lincoln's grant of an exclusive license to Monsanto to the rights and intellectual property of the dicamba-tolerant seed trait and declare BASF has no rights in the matter.

171.   On May 18, 2006, Monsanto intervened in the lawsuit filed by the Board of Regents of the University of Nebraska against BASF asking the court to grant Monsanto exclusive rights

and to declare that BASF does not possess any right, title, or interest in a non-exclusive license in the patents and technology that ultimately led to BASF/Monsanto's dicamba-tolerant crop system.

172.   In 2007, BASF and Monsanto publicly stated they will dedicate a joint budget of $1.5 billion for a research and development collaboration to fund a pipeline of yield and stress tolerance traits for corn, soybeans, cotton and canola.

173.   By March 22, 2007, BASF and Monsanto made a research and development joint collaboration for a "new" approach to the food system, using dicamba-tolerant crop system for in-crop use for the first time.

174.   BASF and Monsanto's partnership involves sharing profits. Monsanto "will market products developed from the collaboration, and will receive 60 percent of net profits, while BASF will receive 40 percent." "The first product developed as a result of the R&D agreement is expected to be commercialized in the first half of the next decade."

175.   The partnership involved the gradual application by Monsanto for "dicamba-tolerant" crops.

176.   By 2007, BASF's plant science unit had also entered a partnership with Monsanto. The plant science division develops genetically-modified seeds for crops such as corn, soybeans, cotton and rice.

177.   BASF has publicly stated, "Monsanto is a *strong partner* with outstanding capabilities."

178.   By June 23, 2008, BASF and Monsanto had entered into an "exclusive agreement for a new fungicide seed treatment solution for soybeans in the United States…The treatment, which is expected to be commercialized in conjunction with the launch of Monsanto's Roundup Ready 2 Yield soybean seed…."

179.    Finally, in 2008, BASF, Monsanto, and the University of Nebraska-Lincoln jointly moved and stipulated to dismiss claims in the University of Nebraska-Lincoln-BASF-Monsanto lawsuit.

180.    Continuing in 2008, Monsanto's Executive Vice President, Carl Casale, stated, "We're pleased to be *partnering* with BASF to deliver new seed-based technology to soybean farmers."

181.    On January 20, 2009, BASF and Monsanto jointly announced that both entities had formally entered into a "new joint-licensing agreement to accelerate the development of the next-generation of dicamba-based weed control chemistry products. Both parties will participate in the development of innovative formulations for dicamba for use with herbicide-resistant cropping systems."

182.    After three years of jointly developing products that, in field testing, "have shown significant yield increases in corn, soy, and canola, the companies collaborated to meet the long-term demand wheat."

183.    In 2010, BASF and Monsanto formed a new agreement that resulted in a potential additional investment of more than $1 billion by the companies over the life of the collaboration.

184.    BASF Plant Science's President, Peter Eckes, stated, "The collaboration with Monsanto was not only the first agreement that we entered, it also represents out most *significant partnership*, covering several large row crops…The expansion of our *partnership* reflects the fit between two companies."

185.    BASF and Monsanto, in a joint press release in 2010, announced:

> "[S]ignificant progress toward launching next-generation dicamba based weed control systems for soybeans and cotton…The companies recently completed joint field testing of new dicamba-based formulations applied over the top of Monsanto's next generation dicamba-tolerant soybean

Page **28** of **75**

technology in development. The research, conducted at Monsanto's Monmouth, IL research facility, demonstrated excellent weed control and *crop safety* on the dicamba-tolerant soybeans."

Defendants are representing that they have tested the crop system, and it has "excellent crop safety."

186.    In a 2010 joint press release, BASF's President of the Crop Protection Division, stated, "The dicamba tolerant system is designed to give growers pre- and post emergence application flexibility...." Stating further, BASF and Monsanto represented, "Additional field studies at various BASF research locations supported these results and *confirmed* significantly improved attributes compared to formulations available in the market today. This *new formulation* work offers even further improvement in physical characteristics that result in *better performance and safety to nearby crops*...aimed at offering farmers multiple modes of action and *superior application timing flexibility* in combating yield-robbing weeds."

187.    On November 2, 2010, BASF and Monsanto issued a joint press release announcing, "significant progress towards a next generation dicamba based weed control system for soybeans and cotton." Monsanto's VP of Crop Protection, Kerry Preete, stated, "Together the strength of the formulation expertise BASF has with dicamba and our team's biotech focus seeks to deliver another breakthrough product in weed control."

188.    On January 6, 2011, Monsanto issued a press release in conjunction with BASF with a list of collaborative "Agronomic Traits Projects," which included, "Dicamba-Tolerant Soybeans (Advanced to Phase 4) – The addition of dicamba-tolerance to the Genuity® Roundup Ready 2 Yield® soybean platform would enable the use of dicamba and glyphosate for pre-plant burndown and in-season weed control, resulting in an effective and high yielding weed management system." Defendants' planned, joint collaboration in products specifically included

the dicamba-tolerant soybean used in the dicamba-tolerant crop system, wherein the herbicide is causing significant damage to Arkansas farmers.

189.    In that same press release on January 6, 2011, Monsanto quoted BASF Plant Science's President, Peter Eckes, stating, "The advances in development show that we chose the right path in our ***partnership*** with Monsanto…BASF is confident that ***our*** genes will result in crops that produce significantly higher yields and that we will be able to make these available to farmers in the future."

190.    Some BASF and Monsanto Projects are jointly funded through each phase of development, and products that emerge from the joint development are commercialized by Monsanto. The profits associated with commercialized products are shared, with Monsanto receiving 60 percent of net profits and BASF receiving 40 percent of net profits.

191.    On March 14, 2011, in a joint press release titled, "BASF and Monsanto Take Dicamba Tolerant Cropping System Collaboration to the Next Level," BASF and Monsanto jointly announced, "[A] new agreement to collaborate on the advancement of ***dicamba tolerant cropping systems***. The companies have granted reciprocal licenses, and BASF has agreed to supply formulated dicamba herbicide products to Monsanto.[1] The agreement will facilitate further development work and subsequent commercialization of a ***dicamba tolerant system***, which includes innovative dicamba formulations proprietary to BASF and the dicamba tolerant trait for soybeans, which is proprietary to Monsanto…the two companies will ***collaborate*** on the development of ***stewardship guidelines and best management practices for the dicamba tolerant system***."

---

[1] BASF and Monsanto Take Dicamba Tolerant Cropping System Collaboration to the Next Level (Monday, March 14, 2011).

192. Further in 2011, Markus Heldt, President of BASF's Crop Protection Division, represented, "Our next generation of products will offer *yet another step change in volatility reduction* while maintaining the highest level of weed control. *The system*, along with proper stewardship measures, will ultimately *deliver peace of mind for growers*." Likewise, Monsanto has represented that a low volatility dicamba herbicide "provides growers and applicators confidence in on-target application of dicamba."

193. After joint testing at Monsanto's research facility in Monmouth, IL, Monsanto and BASF jointly stated, "*Joint development of stewardship, education programs, and best practices* will support long term sustainability of the DT [dicamba-tolerant] system." This jointly used proprietary, seed-herbicide system was neither endorsed, nor recommended by the EPA; however, it was conditionally approved for responsible use for two years.

194. This partnership and joint venture permitted BASF to register BASF's dicamba herbicide Engenia with the EPA registration designed to be used with dicamba-tolerant genetic seed traits.

195. Again, in 2015, BASF and Monsanto jointly announced:

> Monsanto Company's annual research and development (R&D) update published today highlights project advancements across the company's six research and development platforms, including: breeding, biotechnology, crop protection, ag microbials, ag biologicals, and precision agriculture, all aimed at sustainably maximizing farmer productivity while utilizing resources like water and land more efficiently. Monsanto has a pipeline of exciting products in development, including yield and stress work in collaboration with BASF Plant Science. This yield and stress collaboration focuses on key row crops with joint investments of $2.5 billion over the life of the collaboration.

196. Monsanto's active partnership with BASF, German chemical company, was designed to accelerate the development of dicamba-based weed control products in the United States and world-wide.

197.    In the United States, BASF Corporation, headquartered in Florham Park, New Jersey, is a wholly-owned and controlled American subsidiary of BASF SE. BASF Corporation manufacture(d) several dicamba herbicides, including Banvel, Clarity, Distinct, Marksman, Status, and Engenia.

198.    In November 2010, Monsanto and BASF jointly stated they recently completed field testing of the dicamba-based herbicides. In tests, the dicamba-tolerant crop system was tested over-the top at Monsanto's research facility in Monmouth, Illinois.

199.    BASF and Monsanto jointly tested, researched and developed the dicamba-tolerant crop system "Monsanto supplied BASF with enough dicamba-tolerant soybean and cotton seed to plant about 40 demonstration plots in 2014." Luke Bozeman, BASF technical market manager with Engenia responsibilities, noted, "We won't be demonstrating the seed per say; we will be demonstrating the use of Engenia a herbicide-seed system to control a wide range of weeds, in particular some of the glyphosate-resistant weeds. The stewardship demonstration component is the second leg – how to apply it so that you don't negatively impact an adjoining sensitive crop." - Luke Bozeman, BASF technical market manager with Engenia responsibilities.

200.    As Monsanto and BASF's dicamba-tolerant crop system was developing toward a point where it would be submitted to government authorities, at least by 2012, weed scientists, agronomic crop growers, and specialty crop growers began warning consumers and growers alike of the danger of dicamba-resistant crops, including dicamba's propensity to volatilize and move onto sensitive, neighboring crops and how dicamba will accelerate the evolution of super weeds.

201.    The new BASF and Monsanto formulation had the same old problem, that is, it would volatilize, move off-target and harm nearby crops. Worse, Defendants advanced the

commercialization under a false pretense – that it could be applied onto crops, over-the-top, for in-crop use, thereby enhancing the danger and imminent harm to nearby non-dicamba-tolerant crops.

202.    During this same time, in 2012, Monsanto submitted its petition to the EPA to register dicamba for in-crop use with cotton.

203.    In 2013, Monsanto submitted its application to deregulate dicamba for in-crop use with genetically modified cotton.

204.    In June 2014, BASF announced plans to boost production of its dicamba weed killers by fifty percent (50%) to keep pace with anticipated demand should Monsanto receive regulatory approval to sell its new GM soybean and cotton products.

205.    Six months later, in January 2015, BASF's plan paid off when the USDA announced its decision (after a five-year investigation) to deregulate Monsanto's dicamba-tolerant crop technology for soybeans and cotton, authorizing the crops for unrestricted commercial planting.

206.    On December 21, 2016, BASF secured EPA approval for its dicamba herbicide, Engenia, for use on dicamba-tolerant soybeans and cotton.

### C.    BASF AND MONSANTO'S ATTEMPTS AT STEWARDSHIP

207.    In Arkansas as well as other farming states, Defendants implemented training, education, curriculum, instruction, supervision, and the means and methods for dicamba herbicide spraying and application. As such, Defendants' represented by their control, conduct and superior knowledge that they had the ultimate responsibility to fully and properly train, educate, and instruct farmers. Through their direct, special relationship with farmers who purchased their seed system, BASF and Monsanto assumed the responsibility to "***explain and promote the proper, responsible use of its products***." Defendants embrace their conduct in the following quotes:

Page **33** of **75**

"BASF's long-standing stewardship *responsibility* to growers through a one-of-a-kind educational program."

"We [Monsanto] are committed to the success and *safety* of our growers. By promoting proper and responsible use of our technologies, we aim to ensure environmental standards are met and the safety of our people and communities is protected."

208. As a core part of Defendants' joint stewardship, education programs, and best practices management, Defendants supplied approximately 600,000 spray nozzles across the country to growers using the dicamba-tolerant crop system. Defendants supplied approximately 60,000 spray nozzles to Arkansas growers using the dicamba-tolerant crop system.

209. Defendants' special relationship with growers using the dicamba-tolerant crop system required them to fully disclose the risks and dangers involved in the distribution of their highly volatile, toxic herbicide seed system to nearby crops. This includes the disclosure of the risk of the mass introduction and expansion of the newly formulated dicamba caused by Defendants' rapid, immense toxic seed system herbicide dump. Monsanto's conservative estimates predicted that dicamba use on soybeans would go *from 233,000 pounds per year to 20.5 million pounds per year*, and dicamba use on cotton could go *from 364,000 pounds per year to 5.2 million pounds per year*. *See* <https://www.aphis.usda.gov/brs/aphisdocs/dicamba_feis_appendices.pdf>.

210. BASF and Monsanto affirmatively engaged in jointly established stewardship guidelines, best management practices, application schools and techniques. BASF and Monsanto entered contractual agreements and created special relationships by interacting with farmers to obtain their trust through instructing and controlling the means and methods by which dicamba-herbicides are sprayed through proprietary stewardship guidelines, best management practices,

superior knowledge and On-Target Application Academies (OTAA). All of which were programs implemented to "teach growers how to minimize drift and make applications of low-volatility Engenia herbicide safe, accurate and effective" and to educate, train, and instruct farmers who purchased the dicamba seeds, creating a direct, special relationship with the farmers who bought the dicamba-tolerant crop system.

## D.    BASF AND MONSANTO REPRESENTATIONS TO THE PUBLIC

211.    BASF and Monsanto have made numerous representations of material fact to the public about their dicamba-tolerant crop system and its use, intended purpose, and safety.

212.    "The dicamba-based herbicide and dicamba-tolerant seed technology were specifically designed for their intended purpose to be used in conjunction with one another as a cropping system, as BASF states, Engenia was "[d]eveloped specifically for dicamba-tolerant cropping systems, Engenia™ herbicide." – Engenia Pre-Registration Brochure for Soybeans.

213.    "We made the decision early on that Engenia was being developed specifically for use in the dicamba-tolerant cropping system. So, we approached the regulatory process from that angle," said Luke Bozeman, BASF technical market manager with Engenia responsibilities. "Engenia has been developed specifically for over-the-top use in dicamba-tolerant soybeans and cotton, and it made the most sense not to broaden the availability to the market place in other areas where the overall stewardship effort could possibly be diluted." - Luke Bozeman, BASF technical market manager with Engenia responsibilities.

214.    "We are aligned with BASF on the majority of things, and our regulatory pieces are obviously in check as we look at weed resistance management *in trying to have on-target applications*." - Ty Witten, North American Crop Protection Systems Lead with Monsanto.

Page **35** of **75**

215. "We are committed to providing farmers with the weed management tools they need to be successful," said Robb Fraley, Monsanto's chief technology officer. "Our work with BASF brings us one step closer to bringing more improved weed control offerings to farmers. We expect the formulations to be an excellent complement to Monsanto's dicamba tolerant seed technologies when they are brought to market."

216. According to a joint press release of BASF and Monsanto, in November 2010, Monsanto and BASF published favorable results of joint field testing of new dicamba-based formulations with Monsanto's next-generation dicamba tolerant soybeans. The new formulations demonstrated excellent weed control ***and crop safety.***

217. BASF, the world's leading chemical company, and Monsanto, the world's leading agriculture technology company, a joint licensing agreement to develop innovative formulations for dicamba for use with dicamba herbicide-resistant cropping systems in January 2009. - <http://www.prnewswire.com/news-releases/basf-and-monsanto-take-dicamba-tolerant-cropping-system-collaboration-to-the-next-level-117927054.html>.

218. Further, on November 2, 2010, in a BASF and Monsanto joint press release, both parties affirmatively warrantied, "This new formulation work offers even further improvement in physical characteristics that ***result in better performance and safety to nearby crops***." - <http://news.monsanto.com/press-release/basf-and-monsanto-announce-progress-dicamba-formulations>.

219. "Successful adoption of the dicamba tolerance trait, into the Roundup Ready® soybean system, will provide: 1) growers with an opportunity for an efficient, effective weed management system; 2) an option to delay or prevent further resistance to glyphosate and other critically important soybean herbicides, in particular, herbicides in the ALS and PPO class of

chemistry; *3) excellent crop safety*, and 4) continue to provide soybean growers with effective weed control systems necessary for production yields to meet the growing needs of the food, feed, and industrial markets." – Monsanto Environmental Protection Agency Petition for 87708 (Xtend Soybean).

220.    In addition to the warranty, assurance and promise of "excellent crop safety," similar representations were made by both, BASF and Monsanto, regarding volatility and drift, the two greatest concerns of off-target movement of the inherently dangerous dicamba-based herbicides, which causes damage to sensitive (non-dicamba-tolerant) crops.

### a.    *BASF Representations Regarding Volatility and Drift.*

221.    Through its agents and representatives, BASF admitted, "There were two critical triggers that were looked at and identified as necessary for Engenia. One of those was maintaining the efficacy of dicamba. We didn't want to lose any of the benefits of the herbicide. The second one was reduction in overall volatility of dicamba and what we tend to call secondary drift or movement. Some off-target movement can be confused with volatility even though it is not a true chemical definition of volatility." – Luke Bozeman, BASF technical market manager with Engenia responsibilities.

222.    Yet, BASF continually represented to the consumers, users, and farmers that Engenia's reduced volatility made it a safe, reliable, corresponding herbicide to be used in the dicamba cropping system, "Engenia herbicide has a positive environmental and toxicological profile. *On-target application is also greatly enhanced*..." - Engenia Pre-Registration Brochure for Soybeans.

223.    "The introduction of dicamba tolerant crops combined with improved dicamba formulations will provide farmers the tools they need to combat the yield-robbing weed resistance

some are facing in their fields today," said Markus Heldt, President of BASF's Crop Protection Division. "Since the introduction of Clarity® in 1992, BASF has continually improved its dicamba offerings. ***Our next generation products will offer yet another step change in volatility reduction*** while maintaining the highest level of weed control. The system, along with proper stewardship measures, ***will ultimately deliver peace of mind for growers***."

224.    According to BASF: "Field research demonstrates on-target herbicide application success with ***low volatility*** and drift, so ***the herbicide remains in place***." - <http://agproducts.basf.us/campaigns/engenia>.

225.    "Advanced formulation ***reduces loss from volatility***." - Engenia Pre-Registration Brochure for Soybeans.

226.    "Although the potential for dicamba ***volatility is low***, the Engenia herbicide formulation was ***developed to further minimize secondary loss due to volatilization***." - Engenia Pre-Registration Brochure for Soybeans.

227.    "An advanced formulation, with a ***70 percent reduction in volatility*** when compared to DGA dicamba." - <http://www.agproducts.basf.us/news-&-events/press-releases/current-press-releases/2016-engenia-herbicide-from-basf-now-registered-by-epa.html>.

228.    "BASF studies of Engenia herbicide indicate superior weed control and crop tolerance, and show that the product will:

> (a)    Be more effective than 2,4-D for residual control of key broadleaf weeds, including waterhemp, common lambsquarters and Palmer amaranth.
>
> (b)    Provide effective post-emergence control of many broadleaf weeds, including smartweed, kochia and cocklebur, as well as superior control of perennial weed Canada thistle compared to 2,4-D.

(c)    Deliver more than 95 percent control of both grasses and problematic

broadleaf weeds when combined with a BASF residual herbicide." -

<https://www.basf.com/us/en/company/news-and-media/news-

releases/2016/12/P-US-16-251.html>.

229.    "Engenia has done great in all of our tests that we use to measure secondary loss

parameters – all the way from the laboratory to field testing using vacuum pumps and air collection

devices. There is a *significant reduction in any secondary loss profile compared to other dicamba

formulations*." - Luke Bozeman, BASF technical market manager with Engenia responsibilities.

230.    "We can positively impact the volatility profile with formulation, which we've

done with Engenia. But once the product is delivered to the persons applying it, then we want to

make sure they have all the tools necessary and all the knowledge necessary to make an application

that does not allow any spray drift onto their neighbors' crops." - Luke Bozeman, BASF technical

market manager with Engenia responsibilities.

231.    "Innovative formulations with proven chemistries are an invaluable asset for weed

resistance management and a cornerstone of sustainable agriculture," said Markus Heldt, President

of BASF's Crop Protection Division. "The dicamba tolerant system is designed give growers pre-

and post-emergence application flexibility, allowing them to better manage their resources and

thus improving productivity," he added.

232.    "Our innovative and expansive product portfolio is *designed to provide you with

crop protection* that gives you a business edge." – <http://www.agproducts.basf.us/>.

233.    "*Beyond protecting your crops, we help you get smarter about the risks you face

so you can protect your business and bottom line*." – <http://www.agproducts.basf.us/>.

234.     On April 10, 2012, Paul Rea, Vice President of BASF's Crop Protection Division, made the following representation, "Farmers fighting herbicide resistance have an important new tool in Engenia which, field research shows, will offer excellent weed control and ***crop safety, as well as low-volatility characteristics for improved on target application***."

235.     In a 2012 interview with Reuters, Markus Heldt, President of BASF's Crop Protection Division, stated, "The newly formulated herbicide has ***minimized volatility***…We are a responsible company…Dicamba is well known. It has been on the market of 50 years. We are not playing with a chemistry that is dangerous." The Defendants represented this "new formulation" of dicamba as safe, and also investigated and represented it as safe to nearby crops, has excellent crop safety, and is safe to the environment. These representations by the Defendants are misleading because of what is not being said about their new product. The facts are dicamba has never been used for in-crop, over-the-top use, and the Defendants new application system requires significant amounts of dicamba sprayed throughout the growing season in multiple applications. Before Defendants' technology, dicamba was typically applied one time, either pre-emergent or post-harvest. The new formulation as represented for in-crop use necessitates a substantial increase in volume of dicamba, which exposes much more acreage and farm crops to damage and injury than ever before. In fact, the EPA was concerned about creating "super weeds" resistant to dicamba because of the massive introduction of dicamba into the crop system. The Defendants omitted this material knowledge and impact on the Arkansas environment from Plaintiffs.

236.     These representations should be put in context with the knowledge and conduct of BASF and Monsanto. Defendants recognizing the need for the massive increase in supply for farmers had a plan to complete their crop system. In 2014, BASF stated, "We foresee a peak sales

potential of €2,300 million for these products, which represents an increase of €200 million compared with the previous year."

237.    BASF further announced, "The expansion supports the company's strategy to increase the production volumes of dicamba, ensuring growers have access to the latest technologies for better weed management programs. For the expansion, BASF invested more than $270 million, making it BASF's largest investment ever in facilities for agricultural products." In 2016, Monsanto's Board of Directors approved an investment of slightly lower than $1 billion in a plant in Luling, Louisiana to expand the drop system and the dicamba herbicides recognizing the planned need to supply the massive increase of dicamba demanded due to the new crop system.

### b.    *Monsanto Representations Regarding Volatility and Drift*

238.    "We are committed to providing farmers with the weed management tools they need to be successful," said Robb Fraley, Monsanto's chief technology officer.

239.    "Our work with BASF brings us one step closer to bringing more improved weed control offerings to farmers. We expect the formulations to be an excellent complement to Monsanto's dicamba tolerant seed technologies when they are brought to market." said Robb Fraley, Monsanto's chief technology officer.

240.    "Various dicamba formulations have been developed over time to *help reduce potential volatilization* while delivering improved weed control and *greater application flexibility. Dicamba has a decades-long history of effective use in the U.S.* and 25 other countries in corn, wheat, fallow and pasture land; on conservation tillage acres; and for residential lawn care." - <http://news.monsanto.com/press-release/corporate/monsanto-and-dupont-sign-dicamba-supply-agreement>.

241. However, the effectiveness of the prior formulations was always for pre-emergent and post-harvest uses as a burndown application, not an in-crop, over-the-top, use.

242. "BASF has a proven track record of bringing innovative formulation technologies to the market that improve the effectiveness and environmental profile of crop protection products." - <http://news.monsanto.com/press-release/basf-and-monsanto-formalize-agreement-develop-dicamba-based-formulation-technologies>.

E.    **BASF AND MONSANTO KNEW OR SHOULD HAVE KNOWN THE DANGEROUS VOLATILITY OF DICAMBA AND SUSCEPTIBILITY OF HIGHLY SENSITIVE NON-DICAMBA-TOLERANT CROPS**

243. It is critical to note that the EPA only conducts drift models when determining risks in the registration of an herbicide because volatilization is too difficult to model (US EPA 2005); although, it is an acknowledged, recognized hazard. The European Food Safety Authority states volatility is as a "Critical area of concern" for dicamba use: "[d]icamba has the potential for long-range transport through the atmosphere." (EFSA 2011, p. 14).

244. Contrary to prior representations of safety, Monsanto and BASF know and acknowledge problems with dicamba-tolerant crop system damage to neighbor crops, such as the Plaintiffs, and similarly situated class members.

245. Commenting on state plant board complaints of dicamba damage due to volatile off-target vapor movement, Ty Witten, North American Crop Protection Systems Lead with Monsanto responded, "***This isn't a new phenomenon. It's not unexpected*** that we would hear some grower challenges and complaints. That happens with these types of chemistries, whether we're talking 2,4-D or dicamba. The symptomology with these is different than with glyphosate or glufosinate, because of the unique symptomology that a growth regulator provides on an auxin-

Page **42** of **75**

type chemistry. People can point to it and say, 'That's what it must be; it must be that new dicamba,' whereas glyphosate injury or others could just look like general crop stress."

246.    "Even though Monsanto has provided and what the science shows is the lowest volatility product out there, you can have environmental conditions that create inversions, or a potential for volatility. These things happen even as early as mid-afternoon to early evening. If you start to apply herbicides at nighttime or really early in the morning, especially in and around some of these." - Ty Witten, North American Crop Protection Systems Lead with Monsanto.

247.    "After reviewing submitted data relating to the volatility of dicamba, and at the time the EPA proposed these new uses, the agency had concerns regarding the volatility of dicamba and possible post-application, vapor-phase off-site transport that might damage non-target plants. Monsanto responded to these concerns with an additional submission post-proposal that acknowledged the long-recognized volatility of dicamba acid and described measurements of the volatilization in the different formulations." -Final Registration on Xtendimax

248.    In the registration comments period, the dangers of dicamba volatility and the sensitivity of non-dicamba-tolerant crops were made abundantly clear. The Center for Food Safety wrote, "Properties of dicamba make it a much greater threat than glyphosate. Like most auxin herbicides, dicamba has very broad-spectrum activity on broadleaf plants, which include cotton and soybeans as well as nearly all vegetables and fruits. *__Auxin herbicides are also very potent, dicamba more so than 2,4-D, such that very low drift-level doses can cause considerable damage__*. Finally, while most herbicides pose a drift threat only during their initial application, *__dicamba is extremely volatile, and is known to volatilize from plant surfaces days after the initial application to move off-target and cause damage to crops and wild plants at considerable distances__*."

249. The EPA had likewise expressed similar concerns of the inherently dangerous volatility of dicamba in the past, where it stated, "Dicamba is a particularly potent poison for many species of plants, especially dicotyledons (dicots, or broadleaf plants) that are sensitive to very low drift levels and to dicamba- contaminated water in semi-aquatic areas." (US EPA 2006) p. 18 – 19.

250. "Dicamba has proven itself to move off-target and cause injury and yield reductions to soybeans and so in a large sense, it is rarely used." Steve Smith, the Director of Agriculture at Red Gold, an Indiana Tomato Based Processor.

251. The Save Our Crops Coalition echoed drift and volatility concerns in the comment period of the EPA registration, stating, "A survey of state pesticide control officials listed dicamba as the pesticide third most commonly involved in drift incidents for two years in a row.[2] This is incidence of drift damage far outpaces the relative use of dicamba.

252. Non-target plant damage associated with herbicide spray drift and volatilization is a major concern for specialty crop growers and processors. Credible estimates   project significant increases in the amount of dicamba that will be applied upon the introduction of dicamba tolerant crops. Dicamba, because of its potential to drift and volatilize, has proven to be one of America's most dangerous herbicides for non-target plant damage. – Save Our Crops Coalition ("SOCC") Final Comment.

253. To misdirect the well-known concerns of dicamba volatility, BASF and Monsanto suggest their field trials, which included field testing in Monmouth, Illinois, support mass introduction of a known hazardous herbicide as an over-the-top application for dicamba-tolerant crops. However, this subterfuge by BASF and Monsanto ignores critical facts.

---

[2] *2005 Pesticide Drift Enforcement Survey Report*, Association of American Pesticide Control Officials (2005), available at http://aapco.ceris.purdue.edu/doc/surveys/DriftEnforce05Rpt.html

254. BASF and Monsanto knew that data produced from field testing in Monmouth, Illinois is not applicable to the temperatures and humidity seen in the mid-south and other areas.

255. As University of Arkansas weed scientist, Tom Barber, accurately stated, "We're just unsure if these new Monsanto VaporGrip formulations have been tested in a 'MidSouth way," says Barber. "Data from somewhere else, Texas or the Midwest, just doesn't translate here. Just because it works in Illinois and Indiana doesn't mean it'll do the same here."

256. University of Arkansas weed scientist, Jason Norsworthy, continued with speculation of BASF and Monsanto's field testing because it couldn't properly collect data applicable to the mid-south, where he accurately stated, "Think about the environmental conditions here," says Norsworthy. "Think about the wind speeds, the temperature swings, the humidity and all the rest. Tom's right: all of that will have an impact on off target movement. Just because the formulation was successfully evaluated in Nebraska or northern Iowa, who cares?...."

257. The inherent temperature and humidity risks of dicamba volatilization have been reported as early as 1979, when after a series of field and glasshouse experiments, Behrens and Lueschen reported, "[T]hat dicamba volatilizing from treated corn could be detected via effects on soybeans for three days after the application; and that dicamba volatilization was enhanced by higher temperatures and lower humidity..."

258. The inherent susceptibility of sensitive, non-dicamba tolerant crops compounds the ultimate risk of the inherently dangerous volatility of dicamba vapor moving and causing damage to off-target crops.

259. As accurately stated by University of Arkansas weed scientist, Tom Barber, "Soybeans are extremely sensitive to dicamba, so just a small amount will produce visual symptoms."

260.   Similarly, University of Illinois weed scientist, Aaron Hager, noted, "It doesn't take much of dicamba to cause damage to sensitive crops and we have a lot of sensitive crops to consider. Having a reduced-volatility formulation does not eliminate physical drift..."

261.   Dicamba has proven especially prone to cause damage. Sciumbaro, Audie S., et al. *Determining Exposure to Auxin-Like Herbicides. I. Quantifying Injury to Cotton and Soybean, Weed Technology*, Vol. 18, 1125-1134 (2004).

262.   Further, University of Georgia weed scientist, Stanley Culpepper, gathered data on crops for five years on which specialty crops (and row crops) suffer serious visual damage when small amounts of dicamba and 2,4-D drift onto them.

263.   Culpepper divided the herbicide sensitivity of crops into four groups: lower sensitivity crops (visually detectable injury symptoms when exposed to more than 1/75 the labeled rate); moderate sensitivity (1/75 to 1/300 the labeled rate); severe sensitivity (1/300 to 1/800 the labeled rate) and extreme sensitivity (less than 1/800 the labeled rate).

264.   Dr. Culpepper recorded the following findings for dicamba sensitive crops:

- Extreme sensitivity: grapes, lima beans, Southern peas, snap beans, soybeans, sweet potatoes and tobacco

- Severe sensitivity: cotton, pepper, tomato and watermelon.

- Moderate sensitivity: cantaloupe, cucumber, peach, peanut and squash.

- Lower sensitivity: broccoli, cabbage, kale, mustard, pecan and turnips.

265.   Dr. Culpepper recorded the following findings for 2,4-D sensitive crops:

- Extreme sensitivity: cotton, grapes, sweet potatoes and tobacco.

- Severe sensitivity: pepper, tomato and watermelon.

- Moderate sensitivity: cantaloupe, canola, cucumber, peaches, peanut, pecan and squash.

- Lower sensitivity: broccoli, cabbage, kale, mustards, onion and turnips.

266. In a similar study, Researchers at the Ohio State University Department of Horticulture and Crop Science conducted a study on the effect of simulated dicamba drift and volatilization on tomatoes grown for processing. Their objective was to quantify the impact of low rates of dicamba on broadleaf crops.

267. According to Researchers at the Ohio State University Department of Horticulture and Crop Science, simulated dicamba drift and volatilization caused tomato bloom to "abort."

268. Applications of dicamba at levels as low as 1/300th of the soybean field rate caused statistically significant losses of tomato crops. The late drift of dicamba, during bloom, caused a 17-77% reduction in marketable fruit when applied at 1/100th of the field rates with respect to plant injury and the potential for yield losses.

269. Notably, tomatoes are less sensitive to dicamba than soybeans and tobacco and roughly, equally as sensitive to dicamba as cotton.

270. By jointly researching and developing dicamba-resistant seeds and dicamba-based weed control products, Defendants' knew dicamba is inherently volatile and can directly harm non-dicamba tolerant crops.

271. The new formulation and dicamba-tolerant crop system implemented by Defendants has directly harmed Plaintiffs, and others similarly situated, whose crops are left in a several mile-wide danger zone surrounded by farmers who purchase Defendants' dicamba-tolerant crop system. Plaintiffs and other Arkansas growers similarly situated are left financially devastated by this inherently volatile and dangerous crop system falsely represented as safe.

## F.   BASF AND MONSANTO'S PLAN TO FLOOD THE MARKET

272.   Upon information and belief, Monsanto and about 100 licensees targeted sales on more than 3 million acres of soybeans and discounted sales by $5 per unit across Monsanto brands in an attempt to compensate for lack of a dicamba herbicide option in 2016. *See* http://agfax.com/2016/04/01/monsanto-basf-dicambia-herbicides-start-epa-public-comment-period-dtn/

273.   Monsanto's discounted sales in 2016 were an effort to flood the market with a seed technology that could damage every other seed technology on the market in order to control and dominate the soybean and cotton markets with conscious, reckless disregard of the consequences.

274.   In a rush to the marketplace with their new, but still, unsafe, inherently and unreasonably dangerous formulation, Defendants sold the system and causing nearby farms to either buy Defendants' products in defense or face financial ruin because crop damage due to off-target herbicide movement.

275.   Due to the massive profits and market dominance of the dicamba-tolerant crop system, Defendants continued their wrongful conduct directed toward the Plaintiffs, and others similarly situated, because of their control of the dicamba-herbicide and dicamba-resistant seed market, suppressing, concealing and omitting information regarding the volatile and injurious nature of their products from Plaintiffs while knowing the harm that Defendants' products could cause to Plaintiffs.

276.   Defendants' scheme and overall conspiracy to control the cotton, soybean, and dicamba herbicide markets, while concealing, omitting and suppressing material facts of the dangers of its product to Plaintiffs, resulted in significant harm, which Defendants knew would result.

277. BASF and Monsanto's dicamba-tolerant crop system resulted in Defendants gaining an increased market share in the soybean and cotton market in Arkansas and other states.

278. Monsanto willfully, wantonly, knowingly and negligently violated the industry practice and legal standards by releasing the dicamba-tolerant crop system on the market without a safe herbicide.

279. Because of Defendants' overarching and predominating wrongful conduct knowing that through their control of the agricultural process involving dicamba-resistant seeds and herbicides, Defendants deceptive, negligent, and fraudulent trade practices by negligently releasing its dicamba-tolerant crop system has caused damage to thousands of acres of farmland and caused millions of dollars of damage to Arkansas farmers, including Plaintiffs.

## G. CONSEQUENCES IN CROP YEAR 2017

280. Consistent with the long-standing, well-known inherent dangers with dicamba, neighboring, off-target, sensitive crops in Arkansas experienced and continues to experience massive crop damage in 2017. Arkansas recently banned the use of dicamba-based herbicide, including Engenia. This ban occurred as part of a formal vote by the Arkansas State Plant Board, approval by the Governor and the Arkansas General Assembly.

281. As of July 20, 2017, the Arkansas State Plant Board has received approximately 720 complaints of damage due to off-target dicamba movement in 2017.

## V. CLASS ACTION ALLEGATIONS

282. Plaintiffs bring this action on behalf of themselves individually and as a regional class action in the States of Arkansas, Missouri and Mississippi pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the following defined class (the "Class"):

> All agriculture farmers and entities who raise non-dicamba-tolerant crops and suffered damage to those crops as a result of Defendants' conspiracy

and wrongful conduct or co-conspirators, or from any predecessors, parents, subsidiaries, or affiliates thereof, between 2015, and the present. Excluded from the Class are Defendants, co-conspirators, parent companies, predecessors, subsidiaries and affiliates, and all governmental entities.

All agriculture farmers and entities who bought dicamba-tolerant seed in order to prevent damage to their crop from dicamba herbicide as a result of Defendants' conspiracy and wrongful conduct or co-conspirators, or from any predecessors, parents, subsidiaries, or affiliates thereof, between 2015, and the present. Excluded from the Class are Defendants, co-conspirators, parent companies, predecessors, subsidiaries and affiliates, and all governmental entities.

283. Plaintiffs believe the approximate size of the Class to be in the thousands and so geographically dispersed throughout the United States that joinder of all class members is impracticable.

284. Plaintiffs' state law claims are typical of the claims of the Class and arise from the same conspiracy and unlawful conduct engaged in by Defendants and co-conspirators as alleged herein.

285. The relief sought by the Plaintiffs is common to the entire class. Judicial rulings in one lawsuit would resolve major legal questions of fact and law, including common defenses in one stroke, including inherent defect of the product and conspiracy to engage in unlawful conduct, which arise from predominating, overarching legal questions that may be decided in one lawsuit regarding Defendants' conduct, which is common and predominates toward all affected Plaintiffs over any individual issues.

286. Further, consolidating the judiciary rulings in this lawsuit would determine the corporate conduct by Defendants, which is uniform and harmed all Plaintiffs. Each Plaintiff was harmed by the co-conspiracy alleged herein and premature release of the volatile and inherently dangerous dicamba-tolerant crop-system.

Page **50** of **75**

287.    Numerous questions of fact or law arise from Defendants' and their co-conspirators' unlawful conduct, which is common, overarching and predominating to the class, including but not limited to:

a.    Whether Defendants and their co-conspirators combined or conspired to control the non-dicamba-tolerant crop market and supply dicamba harmful to non-dicamba tolerant crops;

b.    Whether Defendants and their co-conspirators engaged in  unfair, false, deceptive or unconscionable behavior;

c.    Whether Defendants and their co-conspirators conduct toward Plaintiffs and the Class was false, deceptive and unconscionable;

d.    Whether Defendants and their co-conspirators were unjustly enriched by the sale of dicamba, which harmed Plaintiffs;

e.    Whether Defendants should make restitution to the Class for damages suffered from Defendants' crop-system;

f.    Whether the Plaintiffs and Class were injured by Defendants' and their co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members;

g.    Whether Defendants and their co-conspirators were negligent by developing, formulating, marketing, and selling an inherently dangerous crop system;

h.    Whether Defendants had a legal duty to innocent parties, including Plaintiffs, to use ordinary care to protect them against the unreasonable risk of harm from their inherently dangerous crop system;

i.    Whether Defendants suppressed, concealed or omitted material facts, as part of their agency, partnership, joint-venture or joint enterprise scheme and device, regarding the volatility to farmers or entities who did not purchase their products;

j.    Whether Defendants were unjustly enriched at the expense of Plaintiffs;

k.    Whether the Plaintiffs and Class are entitled to injunctive relief;

l.    Whether class punitive damages should be imposed upon Defendants for their reckless or corporate conduct, which was engaged in a pursuit and

course of action, which Defendants knew or should have known would harm Plaintiffs

288.    The questions of fact or law common to the Class are overarching and predominate as a threshold matter over any individual questions affecting members of the Class.

289.    The Plaintiffs will fairly and adequately represent the interests of the Class and have no interest that is in conflict or antagonistic to the Class.  Plaintiffs have retained counsel who are competent and experienced in agriculture, toxic torts, class action and complex litigation.

290.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the class as a whole.

291.    A class action is procedurally superior to any alternatives for adjudicating the claims of the Plaintiffs and members of the Class.  The claims of the members of the Class are small and can be consolidated into one lawsuit to decide the predominating issue of liability.  Permitting this lawsuit to proceed utilizing the class mechanism will eliminate multiple litigation over the same common issues of fact and liability and the probability of and risk of inconsistent decisions establishing varying standards of conduct for the Defendants.

292.    Finally, maintenance of the lawsuit as a class action will promote judicial economy, efficiency and fairness to all parties involved.

## VI.    TRADE AND COMMERCE

293.    During the relevant time periods alleged herein, the Defendants, their agents, joint-venturers, joint enterprise, partners and co-conspirators engaged in wrongful and unlawful conduct

and control of the dicamba market affecting trade and commerce throughout the fifty (50) states, including this judicial district.

294.    Entities or agents not named as Defendants have directly participated in the unlawful conduct and conspiracy alleged herein and have performed acts and made statements in furtherance thereof.

295.    While actively engaged in the management, direction or control of its affairs, each of the co-conspirators performed each of the acts alleged herein, or alternatively, each co-conspirator authorized or ordered duly authorized officers, agents, employees or representatives to perform said acts.

296.    Defendants are liable for unlawful acts performed in furtherance of the alleged conspiracy by companies acquired through mergers and acquisitions.

## VII.   CAUSES OF ACTION

### A.   FIRST CAUSE OF ACTION - STRICT PRODUCTS LIABILITY
### (Ark. Code § 4-86-102)

297.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein. Pursuant to Ark. Code Ann. § 4-86-102 of the Arkansas Code, a supplier of a product is liable for harm to another person or his property if: (1) The supplier is engaged in the business of manufacturing, selling, or distributing the product; (2) The product was supplied by him in a defective condition that rendered it unreasonably dangerous; and (3) The defective condition was a proximate cause of the harm to person or to property.

298.    Defendants have a partnership, joint-venture and joint-enterprise for the dicamba-crop system for supplying to the marketplace in Arkansas, and other states, genetically modified seeds represented as dicamba-tolerant, which require a compatible dicamba-tolerant herbicide associated with the same genetic traits.

Page **53** of **75**

299.   Each of the Defendants is engaged in the business of variously manufacturing, selling, and distributing the dicamba-tolerant crop system and is a "supplier" the dicamba-tolerant crop system for the purpose of Ark. Code Ann. § 4-86-102 of the Arkansas Code.

300.   The Defendants supplied defective seed and herbicide products in a dicamba-tolerant crop system that cannot be used in a safe manner, which prevents injury to non-target crops.

301.   The Defendants supplied defective dicamba-tolerant crop system in a defective condition that rendered their products unsafe and unreasonably dangerous and exposed innocent third parties' crops to an unsafe, inherently dangerous and volatile herbicide.

302.   The Defendants supplying defective dicamba-tolerant crop system was a direct result proximate cause of the harm to Plaintiffs.

303.   Each Defendant is strictly liable for all damages to each plaintiff proximately caused by their defective dicamba-tolerant crop system.

## B.   SECOND CAUSE OF ACTION - NEGLIGENCE

304.   Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

305.   Negligent Design and Formulation:   Each of the Defendants has a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm.  Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed in the subject area. Each of the Defendants, therefore, failed to use ordinary care in the design and selection of materials and formulation in its products.  The negligent design and selection of materials was a proximate cause of the harm to Plaintiffs.  The dicamba products sold by Defendants were so inherently dangerous to neighboring non-dicamba tolerant or resistant crops

Page **54** of **75**

as to be unsafe for distribution and use in Arkansas. Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

306.    Negligent Testing: Each of the Defendants had an affirmative, non-delegable duty to test its products alone and in combination with dicamba-containing products that each of the Defendants recommended be used in order to determine the extent to which drift would injure off-target crops, and to provide such instructions and take other appropriate measures as are necessary to prevent such drift injuries. Each of the Defendants failed to adequately test its products or to take appropriate steps to prevent such damage. Each of the Defendants' negligent testing was a proximate cause of the harm to Plaintiffs. Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

307.    Inadequate Warning, Instruction, and Training: Defendants have a non-delegable duty to give a reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of the product and to provide such instructions as are necessary to permit the reasonably safe use of the product.

308.    Defendants sold their dicamba-tolerant crop system to farmers knowing that herbicides could not be safely used and there was a significant and imminent disastrous risk to neighbors' crops, which are not dicamba-tolerant.

309.    Each of the Defendants jointly failed to provide adequate, warning, training and instruction of dangers inherent with its dicamba-tolerant crop system.

310.    Each of the Defendants violated its affirmative duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of their products, including the danger of causing significant and far-reaching off-target movement, migration and

drift of dicamba-containing products in amounts that cause severe damage to crops other than those grown from dicamba seeds.

311.   Likewise, none of the product labels contain instruction for use that would, if followed, make it possible to use the dicamba seeds with a reasonable expectation that harm to collateral non-target crops would not be harmed.

312.   The inadequate warnings were a proximate cause of the harm to Plaintiffs. Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

313.   In addition to the foregoing negligence, the Defendants were negligent in distributing and selling dicamba seeds to the other Defendants without warning them of the impropriety of suggesting the use of dicamba-containing products without limitations or modifications to make its use reasonably safe or without agreed restrictions on the products use so as to avoid it being sold into an area at a time where harm to sensitive crops would be likely to occur.

314.   Furthermore, Defendants were further negligent in their failure to provide adequate education, information, instruction and products for their dicamba-tolerant crop system knowing that it was released without adequate testing and knowing of the inherent danger and volatility of its product once released in the market and used by neighboring crops, such as Plaintiffs.

315.   The distributing Defendants were negligent in selling their dicamba-tolerant system in the subject area given that they knew or should have known that using dicamba-containing products posed an unreasonable risk of harm to nearby crops, given the physical proximity of the two crops, time of use, and the history of crop damage occurring in the area from the use of dicamba-containing products.

316.   BASF and Monsanto had an affirmative obligation to properly and fully train, educate, inform, and instruct farmers, including full disclosure of the vast, expansive nature of the spraying operation and campaign waged on palmer amaranth ("pigweed").

317.   BASF and Monsanto were negligent in their training, supervision, education, curriculum, information, demonstrations, testing, instructions, omissions, actions, and conduct, in implementing their dicamba-tolerant crop system in Arkansas. Defendants' knowingly and negligently withheld or omitted critical information from consumers, which caused significant damage to innocent third-parties, including Plaintiffs.

318.   BASF and Monsanto negligently released a new formulated dicamba system without proper distribution, training, education, information, demonstration and teaching. BASF and Monsanto completely occupy the dicamba-tolerant crop system in Arkansas and the training for the safe and responsible use of their dicamba products.

319.   Farmers who purchased the BASF/Monsanto dicamba products "were conscientious about their responsibilities in connection with the use" of Defendants' products. According to Robb Fraley, the Chief Technology Officer of Monsanto, farmers "knew all about the application requirements to help minimize any risk of off-target movement, and many told me they'd attended one or more of the learning events where we've hosted nearly 50,000 custom applicators, grower applicators and other key stakeholders at venues across the country."

320.   However, BASF and Monsanto failed to properly teach, train, and instruct their application requirements to farmers regarding their dicamba training system at on-target application academies. The necessity for on-target application training for their dicamba-tolerant products was magnified by the massive distribution and dispersion of their product in Arkansas without proper instruction and disclosure of the hazards of the new formula to farmers.

321. BASF and Monsanto have superior, intricate, proprietary knowledge of the dangers and risks associated with Defendants' products, which were unavailable to the public, consumers, and farmers. BASF and Monsanto have a non-delegable to duty to sell and distribute a safe crop system. BASF represents it has "a very knowledgeable and experienced staff of experts in on-target applications of dicamba."

322. BASF and Monsanto failed to conduct sufficient training, education, supervision and demonstrations to all farmers who purchased their dicamba-tolerant crop system, thus, imminently exposing nearby crops to damage regardless the degree of care.

323. BASF and Monsanto have a non-delegable duty owed to farmers who buy the dicamba system to prevent harm to neighbor's crops, including Plaintiffs. BASF and Monsanto have a non-delegable duty to properly distribute, train, educate, information, demonstration, supervise and teach the responsible use of their new dicamba formula.

324. BASF and Monsanto cannot delegate their knowledge and inherent risk with their product without proper distribution, training, education, information, demonstration and teaching. BASF and Monsanto must supply proper educators, education, curriculum, training education, demonstrations, teaching and full disclosure of volatility to nearby crops.

325. BASF and Monsanto breached these affirmative non-delegable duties, responsibilities and obligations owed to the farmers who purchased their dicamba-tolerant products directly resulting in damage to Plaintiffs' crops. BASF and Monsanto further knowingly misrepresented the safety of their dicamba-tolerant products to nearby crops in representations made to farmers in Arkansas.

## C.   THIRD CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

326.   Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

327.   Each of the Plaintiffs has sustained damage due to Defendants' unsafe, defective, inherently dangerous and volatile dicamba-tolerant crop system.

328.   Each Defendant knew that dicamba seeds would be used for the particular purpose of providing protection against dicamba-based herbicides.

329.   Each Defendant knew that farmers and the applicators who apply herbicides on behalf of farmers rely on the Defendants' skill and judgment to encourage the use of a suitable herbicide for weed control that will not damage off-target crops northeastern Arkansas, including adequate instructions and limitations on use, thereby impliedly warranting the product to be safe and suitable for that particular purpose.

330.   Defendants' products as designed, manufactured and labeled, were unsafe, inherently dangerous, not fit for the particular purpose for which they were required in that the product as designed, formulated and labeled posed an inherent risk to crops being grown in the region and the product therefore breached the implied warranty for fitness for a particular purpose rendering Defendants liable to Plaintiffs for their damages arising from such harm.

331.   The unsafe, volatility, inherent danger and unfitness of Defendants' products were a proximate cause of Plaintiffs' damages.

332.   Plaintiffs are people whom Defendants would reasonably have expected to be affected by their unsafe, dangerous, volatile and inherently dangerous dicamba-tolerant crop system.

## D.    FOURTH CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

333.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

334.    A seller impliedly warrants that a product is merchantable at the time the product is sold.  To be merchantable, a product must be fit for the ordinary purposes for which the product is used, and the product must be adequately labeled and must conform to any promises or affirmations of fact made on the container or label.

335.    Each of the Plaintiffs has sustained damage due to exposure to Defendants unsafe, defective, volatile and inherently dangerous dicamba-tolerant crop system.

336.    Defendants sold dicamba-tolerant crop systems, which were not merchantable in that the product as designed, formulated, and labeled posed an unsafe and inherent risk to crops being grown in the region.

337.    The unfitness of Defendants' products was a proximate cause of Plaintiffs' damages.  Plaintiffs are people whom Defendants would reasonably have expected to be affected by Defendants unsafe, defective, volatile, and inherently dangerous dicamba-tolerant crop system.

## E.    FIFTH CAUSE OF ACTION - ARKANSAS DECEPTIVE TRADE PRACTICES ACT (Ark. Code § 4-88-101, *et seq.*)

338.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

339.    Each of the Defendants is a "person" for the purposes of the Arkansas Deceptive Trade Practices Act pursuant to Ark. Code Ann. § 4-88-102(3).

340.    Dicamba seeds and dicamba herbicides constitute "good(s)" within the meaning of Ark. Code Ann. § 4-88-102(6).

341.    Pursuant to Arkansas Code Annotated section § 4-88-108, it is unlawful for any person to use deception, fraud, or false pretense in, or to conceal, suppress, or omit material facts in connection with the sale or advertisement of goods, such as dicamba seeds, and Engenia® herbicide.

342.    Pursuant to Arkansas Code Annotated section § 4-88-107(a)(1), it is unlawful for any person to knowingly make false representations as to the characteristics of goods.

343.    Pursuant to Arkansas Code Annotated section § 4-88-107(a)(10), it is unlawful in Arkansas to engage in an "unconscionable, false, or deceptive act or practice in business, commerce, or trade." Further, pursuant to Arkansas Code Annotated section § 4-88-107(b), "[t]he deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

344.    Defendants engaged in unconscionable, false, and deceptive acts and practices in selling and labeling its product to imply that the product could safely be used in northeastern Arkansas, when each Defendant knew or should have known, if exercising ordinary care, that this was not the case. Each Defendant also knew or should have known that the use of the product as labeled posed a risk to area crops that was beyond the control of the user, when following the label or other instructions.

345.    Defendants' customers, including Plaintiffs and members of the Class, were subjected to suppression, concealment and omission of material facts as a product of collusive, unlawful efforts by Defendants to control the market and suppress, conceal and omit from

Plaintiffs, and others similarly situation, that their products posed a risk to area crops that was beyond the control of the user, when following the label or other instructions.

346.     As a result of Defendants' fraudulent concealment of their conspiracy and unlawful, unconscionable, false, fraudulent, unfair and deceptive conduct directed toward Plaintiffs, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class members have as a result of the wrongful and unlawful conduct alleged in this complaint.

347.     Plaintiffs have a cause of action against each Defendant pursuant to Arkansas Code Annotated section § 4-88-113, to recover their damages related to crop injury, as well as reasonable attorneys' fees.

**F.       SIXTH CAUSE OF ACTION - FRAUDULENT CONCEALMENT**

348.     Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

349.     Before Defendants sold dicamba seeds, Engenia herbicide and their dicamba-tolerant crop system, and during the entire time of the sale, Defendants knew the inherently, unreasonable risks to third parties of herbicide spraying on neighboring non-dicamba tolerant crops and crop fields. Further, Defendants were aware that by selling their dicamba-tolerant crop system, they were creating a situation in which their volatile herbicide would create imminent risk and harm to non-dicamba tolerant crops, thus, creating serious harm and financial ruin.

350.     Defendants misled Arkansas farmers by representing dicamba-based herbicides are safe and provide safety to nearby crops when used for in-crop, over-the-top use. However, put simply, there is no safe way to apply Engenia or any type of dicamba herbicide over-the-top without causing collateral damage to nearby crops that are not dicamba-tolerant.

Page **62** of **75**

351. Farmers relied on Defendants to produce a safe and approved, corresponding herbicide that would be sold on the market in Arkansas.

352. Defendants were long aware and on notice of the damages that would result to third parties because of their unsafe, defective, inherently dangerous, hazardous and volatile crop system, yet despite this knowledge Defendants rushed their products to the marketplace knowing of the imminent harm Plaintiffs, and others similarly situated, faced with the introduction of their dangerous products to the marketplace.

353. Moreover, despite the knowledge that its dicamba-tolerant crop products would cause imminent harm, Defendants affirmatively concealed these facts from farmers, federal and state regulatory bodies, farming associations, legislative bodies, the general public, and the Plaintiffs.

354. The groups from which Defendants concealed these facts were unaware of the facts. Defendants also represented the safety of their products while knowing and suppressing the truth of the inherent volatility of their product and imminent danger to crops that were not tolerant to dicamba.

355. The concealed information was material to all the groups described above.

356. Defendants knew of the groups' ignorance of the truth and intentionally withheld the truth about dicamba-tolerant seeds, Engenia herbicide and their crop products' imminent risks to neighboring crops when released into the marketplace.

357. As a result of the concealment of these facts, farmers purchased dicamba seeds and sprayed dicamba-containing herbicide, regulatory and legislative bodies were unable to protect the public, and Plaintiffs were harmed.

### G.      SEVENTH CAUSE OF ACTION - EXPRESS WARRANTY

358.     Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

359.     At all relevant times, Defendants engaged in the business of creating, testing, developing, designing, manufacturing, marketing, advertising, promoting, selling, wholesaling, distributing and representing its dicamba-tolerant crop products, which are unsafe, hazardous, defective and unreasonably dangerous to purchasers, consumers, end-users and persons reasonably expected to be affected, including Plaintiffs, thereby placing dicamba-tolerant crop products into the stream of commerce. These actions were under Defendants' ultimate direction, control and supervision.

360.     Defendants expressly and impliedly represented, warranted and made assurances to the general public, purchasers, consumers, end-users and persons reasonably expected to be affected of the safety of its dicamba-tolerant crop system, including Engenia® and dicamba-tolerant seeds, by and through statements made in labels, publications, package inserts, and other written materials intended for purchasers and public to induce reliance and generate interest in and mass sales of its products and control the overall market for a general purpose herbicide and herbicide that is formulated with genetically-modified seeds.

361.     Defendants made affirmative warranties, representations, assurances and guarantees of safety for human health and the environment, that its dicamba-tolerant crop products were effective for herbicide control, were safe and proper for their intended use and would not cause harm to crops. Defendants made these affirmative warranties, representations, assurances and guarantees of safety for human health while knowing that its dicamba-tolerant crop products could cause extensive harm and injury to non-dicamba-tolerant crops, fruits and nuts.

362. Moreover, Defendants engaged in an aggressive and active campaign to suppress and conceal the harmful facts from the public so that its overall warranties, representations, assurances and guarantees of safety could generate a message to the public and purchasers that the dicamba-tolerant crop system was, in essence, a new, revolutionary, miracle type of herbicide that consumers and purchasers would feel compelled to purchase, but, not knowing that the herbicide was volatile and would harm non-dicamba-tolerant crops.

363. Defendants' express and implied warranties including those made directly through their company and representatives, included false, deceptive and incomplete warnings and instructions that purport, but deceptively fail, to include the complete array of risks associated with use of and/or exposure to dicamba. Defendants knew that risks expressly included in their products warning labels did not and do not accurately or adequately set forth the risks of developing the serious and permanent injuries to crops directly experienced by Plaintiffs and others in the public.

364. Defendants aggressively campaigned to market, promote, advertise and warrant its dicamba-tolerant crop system products as safe and effective for the public as a general purpose agricultural herbicide, particularly when paired with dicamba resistant seeds. These representations, warranties and assurances about the dicamba-tolerant products contained or constituted affirmations of material fact or promises made by Defendants to the buyer and general public, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations, be safe for their intended purpose, and not cause serious and permanent harm to non-dicamba-tolerant crops.

365. Defendants placed its dicamba seeds and Engenia® products into the stream of commerce for sale and recommended their use to consumers and purchasers and the general public

without adequately warning of and disclosing the true risks and dangers associated with exposure to the new formulations of dicamba used for GMO dicamba-tolerant crop seeds.

366. Defendants breached these warranties because, among other things, its dicamba-tolerant crop system, including Engenia®, was unsafe, hazardous, dangerous, unfit and unsafe for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

367. Defendants publicly represented that its dicamba-tolerant crop products were safe for use and made affirmative, fraudulent, misleading and deceptive statements to conceal the dangers and risks associated with their crop products and known to exist. However, as part of its overall scheme to conceal and hide this negative information about its herbicide products, Defendants fraudulently concealed the information from people to hide and cover up the risk of harm to non-dicamba-tolerant crops.

368. Defendants knew that the active ingredient in dicamba was harmful to non-dicamba-tolerant crops and due to the massive increase in the use of dicamba because of the aggressive, marketing, promotion and advertising campaign, and precluded safer alternatives from entering the marketplace.

369. Defendants also knew that there is no herbicide formulation available to reduce the volatility in dicamba. Defendants knew that the herbicide would be ineffective if the formula was reduced to a point where it is not volatile.

370. Defendants violated ordinary care and prudent corporate behavior and responsibility through its labeling, advertising, marketing, promotion, representations, assurances and warranties that its dicamba-tolerant crop producers were safe and fraudulently withheld,

suppressed, omitted and concealed information about the risks of serious and permanent injury to crops associated with use of and/or exposure to dicamba formulations by expressly limiting the risks and hazards associated with use and/or exposure within its warning and labels.

371. Defendants had sole access to material facts and information concerning the nature of the risk and hazards associated with its dicamba-tolerant crop products. Defendants knew that purchasers, consumers and the general public would rely on labeling, advertising, marketing, promotion, its representations, assurances and warranties that its herbicides and dicamba-tolerant crop system was safe for its intended use and would not harm nearby neighbor's crops.

372. Defendants knew through its superior knowledge and dominant and superior position in the marketplace that it could conceal, hide, suppress and cover-up the facts, data and research about its dicamba-tolerant crop products. Therefore, in an effort to maximize its revenue, Defendants took affirmative steps to engage in such massive cover-up through the science and research of the dicamba-tolerant crop products and through regulatory agencies. Monsanto had knowledge that its labels and information were inadequate, inaccurate and false, yet perpetuated this suppression and concealment campaign to hide the truth from the general public, consumers and affected persons about the dangers associated with its dicamba-tolerant crop products.

373. Plaintiffs and others similarly situated are affected persons who had no knowledge of the falsity, fraud or incompleteness of Defendants' statements, representations, assurances and warranties concerning dicamba-tolerant crop products, Engenia® and the dicamb-tolerant crop system's safety and safety to nearby crops.

374. Plaintiffs' crops were exposed to Defendants' dicamba products, and Defendants knew they would be exposed by their research, development, design, testing, formulation, manufacture, inspection, labeling, distribution, packaging, marketing, promotion, advertising,

public representation, assurances and warranties made directly to the Plaintiffs and released into Arkansas, Missouri, Mississippi, the fifty states, the general marketplace and stream of commerce by Defendants.

375.     Defendants could have prevented the serious imminent harm suffered by Plaintiffs if (1) Defendants not engaged in a massive world-wide and campaign in the United States, including Arkansas, Mississippi and Missouri, to hide, conceal, omit and suppress the truth of the dangers and risks associated with its herbicide products and dicamba-tolerant crop system, and (2) had Defendants made truthful representations, warranties, assurances and statements of fact about the dangers associated with the use of and exposure to its herbicide products and dicamba-tolerant crop system.

376.     Defendants breached their express warranties to the Plaintiffs and implied warranties to Plaintiffs in that their dicamba-tolerant crop products were not of merchantable quality, safe, or fit for their intended use.  Defendants' dicamba-tolerant crop products have inherent, unsafe, hazardous, volatile and dangerous propensities, which directly resulted in and caused serious and permanent harm and injury to Plaintiffs' crops, which would not have occurred, but for the unsafe products and but for Defendants' statements, representations, warranties, assurances and guarantees that its products conform to and are a safe product for public use and would not harm nearby crops.

377.     Defendants knew the dicamba-tolerant crop products would not conform to any label because Defendants hid, concealed and suppressed the truth about the danger of its products and made false representations of material fact directly resulting in and causing harm to the Plaintiffs for which Plaintiffs seek remedy under breach of express and implied warranties.

378. Plaintiffs have provided notice by federal express and certified mail to Defendants of their breach of warranty claims prior to serving this lawsuit.

## H.   EIGHTH CAUSE OF ACTION - FRAUD

379. Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

380. Defendants made a false representation of material fact when they represented, advertised and promoted the sale and use of dicamba seeds as a higher-yielding and safe soybean seed and that dicamba-tolerant crop system was safe for neighboring crops.

381. Defendants made a false representation of material fact when they represented, advertised and promoted the use of dicamba seeds, knowing the dicamba-containing herbicide used in conjunction with the seeds would harm any crops that were not dicamba-resistant.

382. Defendants made a false representation of material fact when they represented, advertised and promoted the sale and use of dicamba seeds for a higher yield, with the knowledge that the seeds would not produce a higher yield and that dicamba-containing herbicides were not safe for neighboring crops.

383. Defendants made a false representation of material fact when they secretly promoted the use of dicamba-containing herbicide with the knowledge that it had not been approved by the EPA.

384. Defendants made a false representation of material fact when they secretly promoted the use of dicamba-containing herbicide to farmers with the knowledge (1) that the herbicide was not approved by the Arkansas Plant Board for use in Arkansas and (2) that the herbicide approved by the Arkansas Plant Board's new formulation was unsafe, inherently dangerous, hazardous, defective and volatile for neighboring crops.

385.    The Plaintiffs, and others similarly situated, justifiably relied upon Defendants' misrepresentations.

386.    Defendants' misrepresentations substantially influenced the farmers to implement the Defendants' dicamba-tolerant crop system.

387.    The Plaintiffs, and others similarly situated, justifiable reliance on the misrepresentations by Defendants and the distributors resulted in damages to valuable property and monetary damages.

388.    The Plaintiffs and others similarly situated spent more money implementing a dangerous crop system that did not produce a higher yield of crops, resulting in monetary damages.

389.    The misrepresentations, which amount to misrepresentation, fraud, deception and deceit, has resulted in detriment and damages to both the farmers who planted the seeds and unsuspecting third-party farmers who did not implement the Defendants' dicamba-tolerant crop system.

## I.    NINTH CAUSE OF ACTION - UNJUST ENRICHMENT

390.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

391.    As a result of their illegal, deceptive, and tortious actions, Defendants have been enriched through the sale of dicamba seeds and Engenia® herbicide products.

392.    By manipulating the public and marketing a product it knew to be unsafe for non-dicamba-resistant crops, Defendants chose to enrich themselves knowing such enrichment would result in the direct destruction of valuable property, including Plaintiffs' and others similarly situated.

393.     Defendants forced third parties to serve as an involuntary experimental testing ground for its new products.  Defendants have enriched themselves by knowingly destroying the crops of innocent third parties, including Plaintiffs and others similarly situated with unlawful gain based upon false, fraudulent and deceptive representations and trade practices to the harm and detriment of others.

394.     Upon information and belief, Defendants have unfairly and unjustly benefited and retained hundreds of millions in profits from the negligent and premature sale of dicamba seeds and its corresponding dicamba-based herbicide, Engenia®, as a direct result of Defendants' unlawful and wrongful actions.

395.     Defendants knew their products were prematurely released, not fully tested as to their inherent volatility and danger and knew they would reap profits at the expense of farmers and crop growers, such as Plaintiffs who did not purchase their products and would be damaged by the inherently volatile nature of their crop-system.

396.     The acceptance and retention of these profits is unjust because the profits are a direct benefit to Defendants as a result of their unlawful tortious conduct resulting in money had and gained by Defendants while damaging and causing detrimental and unjust harm to Plaintiffs and others similarly situated where equity and good conscience would require restitution and disgorgement.

397.     Defendants should pay and make restitution for damage experienced by Plaintiffs, and others similarly situated, and be ordered to disgorge all unjust enrichment it has received to date and will receive for the next five (5) years from all sale of their dicamba-tolerant seed and herbicide products.

## J.   TENTH CAUSE OF ACTION - CIVIL CONSPIRACY

398.   Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

399.   Defendants, in an unlawful, fraudulent, deceptive scheme and device to improperly market and expand the sales of its defective dicamba-tolerant crop system, conspired to place unsafe, defective, inherently dangerous, hazardous and volatile herbicides on the marketplace with GMO seeds that were dicamba-tolerant when Defendants knew that nearby neighboring crops which were not dicamba-tolerant would be harmed, injured or wiped out, causing financial harm and forcing those farmers to buy their dicamba-tolerant crop system to avoid crop failure and financial ruin.

400.   The object of the unlawful conspiracy and agreement was the unlawful marketing of Defendants' defective dicamba-tolerant crop system, the protection of its dicamba seeds and crops through the illegal spraying of dicamba-containing herbicides on those seeds and crops and a proliferation of its dicamba seeds through marketing to corner the market for genetically modified soybeans and cotton such that farmers in Arkansas would have no choice but to purchase Monsanto's dicamba seeds or risk destruction to their non-dicamba tolerant crops.

401.   Defendants, through their agents and representatives, encouraged and directed its purchasers to spray dicamba-based herbicides on the dicamba-tolerant seeds even though Defendants knew the volatile dicamba herbicide would drift to nearby crops and injure the crops.

402.   Defendants' scheme to sell more dicamba seeds and dicamba-based herbicides by harming those farmers that did not originally purchase the dicamba-resistant seeds caused severe, imminent and irreversible harm to the Plaintiffs' land, crops, and livelihoods.

403.    Defendants' unlawful and wrongful actions resulted in extensive damages to Plaintiffs, and others similarly situated, for which the Defendants should be held liable.

## VIII. PUNITIVE DAMAGES

404.    Defendants knew or should have known that their products are unsafe, volatile, defective, inherently dangerous and misbranded.  Defendants knew or should have known that: (a) dicamba-containing products have a propensity to drift great distances in minute amounts, (b) that dicamba is severely phytotoxic to non-target crops, (c) that non-target are grown in the same vicinity in northeastern Arkansas as dicamba seeds, and (d) that dicamba has caused damage to crops in northeastern Arkansas in the past.  Despite this knowledge, each Defendant continued to manufacture, market, sell, supply, and distribute dicamba seeds, which constitutes a conscious disregard for the welfare of others and their property, from which malice and wanton or reckless disregard for public safety can be inferred.

405.    Defendants' campaign to market and rapidly commercialize the dicamba-tolerant crop system, including Engenia®, and other herbicides, was premised on its ability to influence data, omit information, direct and control data and information disseminated or not disseminated about the dicamba-tolerant crop system dangers and hazards to nearby non-dicamba tolerant crops. Defendants knowingly suppressed, concealed and omitted from the public the truth about the dangers and hazards of its herbicide products to non-dicamba tolerant crops.  However, knowing that its herbicide and dicamba-tolerant crop products were unsafe and volatile to nearby crops, Defendants intentionally pursued a course and pattern of corporate conduct where it knew, or ought to have known, in light of the evidence and surrounding circumstances, that it was going to conceal, suppress and omit material information about the danger to humans its products, in order to reach billions in sales and control the marketplace for dicamba-based herbicide for their dicamba

seeds. Defendants deliberately and consciously chose billions in profits over the safety and financial well-being of farmers who did not buy dicamba-tolerant crops.

## IX. JURY TRIAL DEMANDED

406. Plaintiffs respectfully demand a trial by jury on all issues so triable.

## X. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully ask this Court:

a) For an order certifying this lawsuit as a class action under Fed. R. Civ. P. rule 23, appointing counsel herein as class counsel and named Plaintiffs as class representatives.

b) For a judgment for actual and compensatory damages in accordance with the proof at trial;

c) For a judgment for punitive damages;

d) For Plaintiffs' costs, expert fees, disbursements and attorneys' fees incurred in prosecuting this action as permitted by statute, common benefit fund, common fund doctrine or other permissible law or doctrine;

e) For restitution and disgorgement of profits that Defendants have received to date and will receive for the next five (5) years;

f) For pre-judgment and post-judgment interest at the maximum lawful rate; and

g) For such other relief as the Court deems just, necessary or proper.

Respectfully submitted,

By:  _____

Paul Byrd, ABN #85020
Joseph Gates, ABN #2010239
**Paul Byrd Law Firm, PLLC**
415 N. McKinley St. Suite 210
Little Rock, Arkansas 72205
Telephone: 501-420-3050
Facsimile: 501-420-3128
paul@paulbyrdlawfirm.com
joseph@paulbyrdlawfirm.com

**Page 74 of 75**

-and-

Jerry Kelly, ABN #84085
**Kelly Law Firm, P.A.**
P.O. Box 500
Lonoke, AR 72086
Telephone: 501-676-5770
jkelly@kellylawfirm.net

-and-

Phillip Duncan, ABN #74039
Richard Quintus, ABN #2000078
William Rob Pointer, ABN #2007216
Timothy P. Reed, ABN #2012210
J. Reid Byrd, ABN #2016219
**Duncan Firm, P.A.**
900 South Shackleford Road, Suite 725
Little Rock, Arkansas 72211
Telephone: 501-228-7600
Facsimile: 501-228-0415
phillip@duncanfirm.com
richard@duncanfirm.com
rob@duncanfirm.com
tim@duncanfirm.com
reid@duncanfirm.com